# VALENTINE, POLICE COMMISSIONER OF NEW YORK CITY, ET AL. *v.* UNITED STATES EX REL. B. COLES NEIDECKER.*

No. 6. Argued October 12, 13, 1936.—Decided November 9, 1936.

---

* Together with No. 7, *Valentine, Police Commissioner, et al.* v. *U. S. ex rel. George W. Neidecker;* and No. 8, *Valentine, Police Commissioner, et al.* v. *U. S. ex rel. Aubrey Neidecker.* On writs of certiorari to the Circuit Court of Appeals for the Second Circuit.

6

*Mr. Porter 'R. Chandler* for petitioners.

*Mr. Frederic R. Coudert, Jr.,* with whom *Messrs. Frederic R. Coudert* and *Mahlon B. Doing* were on the brief, for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Respondents sued out writs of *habeas corpus* to prevent their extradition to France under the Treaty of 1909. 37 Stat. 1526. They are native-born citizens of the United States and are charged with the commission of crimes in France which are among the extraditable offenses specified in the treaty. Having fled to the United States, they were arrested in New York City, on the request of the French authorities, under a preliminary warrant issued by a United States Commissioner and were held for extradition proceedings. By the writs of *habeas corpus* the jurisdiction of the Commissioner was challenged upon the ground that because the treaty excepted citizens of the United States, the President had no constitutional authority to surrender the respondents to the French Republic.

The controlling provisions of the treaty are as follows:

"Article I. The Government of the United States and the Government of France mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes or offences specified in the following article, committed within the jurisdiction of one of the contracting Parties, shall seek an asylum or be found within the territories of the other: Provided That this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her

apprehension and commitment for trial if the crime or offence had been there committed.

.    .    .    .    .

"Article V. Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention."

The Circuit Court of Appeals, reversing the orders of the District Judge, sustained the contention of the repondents and directed their discharge. 81 F. (2d) 32. This Court granted certiorari.

*First.* The question is not one of policy, but of legal authority. The United States has favored the extradition of nationals of the asylum state and has sought—frequently without success—to negotiate treaties of extradition including them.[1] Several of our treaties have made no exception of nationals.[2] This is true of the treaties with Great Britain from the beginning, of the treaty with France of 1843, and of that with Italy of 1868. *Charlton* v. *Kelly,* 229 U. S. 447, 467. Where treaties have provided for the extradition of persons without exception, the United States has always construed its obligation as embracing its citizens. *Id.,* p. 468. In the opinion in *Charlton* v. *Kelly* we alluded to the fact that it had "come to be the practice with a preponderant number of nations to refuse to deliver its citizens" and it was observed that this exception was of modern origin. The

---

[1] Moore, Int. Law Dig., vol. IV, § 594; Moore on Extradition, vol. I, pp. 159–162.

[2] Great Britain, 1794, Art. XXVII, 1 Malloy, Treaties, p. 605; 1842, Art. X, *id.,* p. 655; 1889, *id.,* p. 740; 1931, 47 Stat. 2122; France, 1843, 1 Malloy, p. 526; Italy, 1868, *Id.,* p. 966. See, also, Switzerland, 1850, Art. XIII, 2 Malloy, p. 1767; Venezuela, 1860, Art. XXVII, 2 Malloy, p. 1854; Dominican Republic, 1867, Art. XXVII, 1 Malloy, p. 413; Nicaragua, 1870, 2 Malloy, p. 1287; Orange Free State, 1871, Article VIII, 2 Malloy, p. 1312; Ecuador, 1872, 1 Malloy, p. 436.

beginning of the exemption was traced to the practice between France and the Low Countries in the eighteenth century. And we found that owing "to the existence in the municipal law of many nations of provisions prohibiting the extradition of citizens, the United States has in several of its extradition treaties clauses exempting citizens from their obligation." Accordingly we divided the treaties in force into two classes, "those which expressly exempt citizens and those which do not." *Id.*, pp. 466, 467.

The effect of the exception of citizens in the treaty with France of 1909—now under consideration—must be determined in the light of the principles which inhere in our constitutional system. The desirability—frequently asserted by the representatives of our Government and demonstrated by their arguments and the discussions of jurists—of providing for the extradition of nationals of the asylum state is not a substitute for constitutional authority. The surrender of its citizens by the Government of the United States must find its sanction in our law.

It cannot be doubted that the power to provide for extradition is a national power; it pertains to the national government and not to the States. *United States* v. *Rauscher,* 119 U. S. 407, 412–414. But, albeit a national power, it is not confided to the Executive in the absence of treaty or legislative provision. At the very beginning, Mr. Jefferson, as Secretary of State, advised the President: "The laws of the United States, like those of England, receive every fugitive, and no authority has been given to their Executives to deliver them up." [3] As stated by John Bassett Moore in his treatise on Extradition—summarizing the precedents—"the general opinion

---

[3] Quoted in Moore on Extradition, vol. I, pp. 22, 23; Moore, Int. Law Dig., vol. IV, p. 246.

has been, and practice has been in accordance with it, that in the absence of a conventional or legislative provision, there is no authority vested in any department of the government to seize a fugitive criminal and surrender him to a foreign power." [4] Counsel for the petitioners do not challenge the soundness of this general opinion and practice. It rests upon the fundamental consideration that the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must be authorized by law. There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given by act of Congress or by the terms of a treaty, it is not enough that statute or treaty does not deny the power to surrender. It must be found that statute or treaty confers the power.

*Second.* Whatever may be the power of the Congress to provide for extradition independent of treaty, that power has not been exercised save in relation to a foreign country or territory "occupied by or under the control of the United States." Act of June 6, 1900, c. 793, 31 Stat. 656. 18 U. S. C. 652. See *Neely* v. *Henkel,* 180 U. S. 109, 122. Aside from that limited provision, the Act of Congress relating to extradition simply defines the procedure to carry out an existing extradition treaty or convention.[5]

The provision is that—"*Whenever there is a treaty or convention for extradition* between the Government of the United States and any foreign government"—a proceeding may be instituted to procure the surrender of a person charged with the commission of a crime specified in the treaty or convention. Upon the apprehension of

---

[4] Moore on Extradition, vol. I, p. 21.

[5] Moore on Extradition, vol. I, p. 50.

the accused, he is entitled to a hearing and, upon evidence deemed to be sufficient to sustain the charge "under the provisions of the proper treaty or convention," the charge with the evidence is to be certified to the Secretary of State to the end that a warrant may issue upon the requisition of the proper authorities of such foreign government, *"for the surrender of such person, according to the stipulations of the treaty or convention."* R. S. 5270; 18 U. S. C. 651.

It is manifest that the Act does not attempt to confer power upon the Executive to surrender any person, much less a citizen of the United States, to a foreign government where an extradition treaty or convention does not provide for such surrender. The question, then, is the narrow one whether the power to surrender the respondents in this instance is conferred by the treaty itself.

*Third.*—It is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties. *Tucker* v. *Alexandroff,* 183 U. S. 424, 437; *Jordan* v. *Tashiro,* 278 U. S. 123, 127; *Factor* v. *Laubenheimer,* 290 U. S. 276, 293, 294. But, in this instance, there is no question for construction so far as the obligations of the treaty are concerned. The treaty is explicit in the denial of any obligation to surrender citizens of the asylum state—"Neither of the contracting Parties shall be bound to deliver up its own citizens."

Does the treaty, while denying an obligation in such case, contain a grant of power to surrender a citizen of the United States in the discretion of the Executive? The Constitution declares a treaty to be the law of the land: It is consequently, as Chief Justice Marshall said in *Foster* v. *Neilson,* 2 Pet. 253, 314, "to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision." See, also, *Head Money Cases,* 112 U. S. 580, 598;

*United States* v. *Rauscher, supra,* p. 418. Examining the treaty in that aspect, it is our duty to interpret it according to its terms. These must be fairly construed, but we cannot add to or detract from them.

Obviously the treaty contains no express grant of the power now invoked. Petitioners point to Article I which states that the two governments "mutually agree to deliver up persons" who are charged with any of the specified offences. Petitioners urge that the word "persons" includes citizens of the asylum state as well as all others. But Article I is the agreement to deliver. It imposes the obligation of that agreement. Article I does not purport to grant any power to surrender save as the power is related to and derived from that obligation. The word "persons" in Article I describes those who fall within the agreement and with respect to whom the obligation is assumed. As Article V provides that there shall be no obligation on the part of either party to deliver up its own citizens, the latter are necessarily excepted from the agreement in Article I and from the "persons" there described. The fact that the exception is contained in a separate article does not alter its effect. That effect is precisely the same as though Article I had read that the two governments "mutually agree to deliver up persons except its own citizens or subjects."

May a grant to the Executive of discretionary power to surrender citizens of the United States be implied? Petitioners seek to find ground for this implication by comparing the expression in Article V "Neither of the contracting parties shall be bound," in relation to the surrender of citizens, with the phrase in Article VI that "A fugitive criminal shall not be surrendered" if the offence charged is of a political character, and the clause in Article VIII that extradition "shall not be granted" where prosecution is barred by limitation according to the laws of the asylum country. This difference in the phrasing

.of denials of obligation would be at the best an extremely tenuous basis for implying a power which in order to exist must be affirmatively granted. Of far greater significance is the fact that a familiar clause—found in several of our treaties—which qualifies the exception of citizens by expressly conferring discretionary power to surrender them was omitted in the treaty with France.

The treaty with Japan of 1886 provided in Article VII [6]—

"Neither of the contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention, but they shall have the power to deliver them up if in their discretion it be deemed proper to do so."

A similar provision is found in the extradition treaties with the Argentine Republic, of 1896, and with the Orange Free State, of 1896.[7] The treaties with Mexico, of 1899, with Guatemala, of 1903, with Nicaragua, of 1905, and with Uruguay, of 1905, expressly lodge the discretionary power with the "executive authority." Thus in the treaty with Mexico of 1899 we find the following article (Art. IV):

"Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this convention, but the executive authority of each shall have

---

[6] 1 Malloy, 1027. Quoted in *Charlton* v. *Kelly*, 229 U. S. 447, 467.

[7] The provision of the treaty with the Argentine Republic, 1896, Art. 3, 1 Malloy, 26, is as follows:

"In no case shall the nationality of the person accused be an impediment to his extradition, under the conditions stipulated by the present treaty, but neither Government shall be bound to deliver its own citizens for extradition under this convention; but either shall have the power to deliver them up, if, in its discretion it be deemed proper to do so."

The same phraseology is used in the treaty with the Orange Free State, 1896, Art. V, 2 Malloy, 1316.

the power to deliver them up, if, in its discretion, it be deemed proper to do so."[8]

We must assume that the representatives of the United States had these clauses before them when they negotiated the treaty with France and that the omission was deliberate. And the fact that our Government had favored extradition treaties without excepting citizens puts the omission of the qualifying grant of discretionary power in a strong light.

Historical background and administrative practice furnish no warrant for reading into the treaty with France a grant which the parties failed to insert. History and practice not only do not support, but they rather negative, the claim of an implied discretionary power. The language of Article V of the treaty with France first appears in our extradition treaty with Prussia in 1852,[9] and it was repeated in a number of later treaties including the Mexican treaty of 1861.[10] It seems that the question as to the effect of the provision first arose under the last-mentioned treaty. Mr. Moore reviews the cases.[11] In 1871 the United States requested the surrender of fugitives who had escaped to Mexico. It appeared that they were Mexican citizens. The Mexican Government refused surrender, stating that its action "should be in strict conformity with the stipulations of the treaty of extradition" and

---

[8] 1 Malloy, 1186. The treaties with Guatemala, 1903, Art. V, 1 Malloy, 881, and with Nicaragua, 1905, 2 Malloy, 1295, have the same provision.

The treaty with Uruguay, 1905, Art. X, 2 Malloy, 1828, provides: "The obligation to grant extradition shall not in any case extend to the citizens of the two parties, but the executive authority of each shall have power to deliver them up, if, in its discretion, it is deemed proper to do so."

[9] 2 Malloy, 1503.

[10] 1 Malloy, 1127.

[11] Moore on Extradition, vol. 1, pp. 164–167; Moore, Int. Law. Dig., vol. IV, pp. 301–303.

with "the practice observed" by the Government of the United States toward the Mexican Government "in similar cases." In 1874, one Perez, a Mexican, committed a murder in Texas and escaped to Mexico. Our Secretary of State, Mr. Fish, instructed the American Ambassador that although the surrender could not be demanded as of right and would not be asked as a favor, or even accepted with an understanding that it would be reciprocated, the circumstances might be made known to the Mexican Government with a view to ascertain whether it would voluntarily surrender the fugitive. The Mexican Government declined the surrender. In another case, arising in 1877, the question of the power of the Mexican Government to surrender its citizens to the United States came before its federal supreme court. While it appeared that the fact of Mexican citizenship was not conclusively established, the court was of the view that the individual guarantees of the Mexican Constitution would not be violated by the surrender.

The question was elaborately considered in the case of Trimble in 1884. He was an American citizen whose extradition was demanded by the Mexican Government. Our Government refused surrender. Mr. Frelinghuysen, Secretary of State, took the ground that as the treaty negatived the obligation to surrender, the President was not invested with legal authority to act. While it is true that Secretary Frelinghuysen later concluded that the question was of such importance that it should receive judicial determination, the view he entertained as to the President's lack of power was cogently stated.[12] Re-

---

[12] Mr. Frelinghuysen's views appear in a report to the Senate. Sen. Ex. Doc. 98, 48th Cong., 1st sess. See Moore on Extradition, vol. 1, pp. 167, 168. Discussing the constitutional powers of the President, Mr. Frelinghuysen concluded:

"Thus it appears that, by the opinions of several Attorneys-General, by the decisions of our courts, and by the rulings of the Depart-

ferring to that view, Mr. Moore adds: "To this position the government of the United States has adhered." [13]

Secretary Bayard in the case of Hudson, in 1888, followed the ruling in the Trimble case. He said: "The treaty provision referred to, which is found similarly stated in

ment of State, the President has not, independent of treaty provision, the power of extraditing an American citizen; and the only question to be considered is whether the treaty with Mexico confers that power.

"By the treaty with Mexico proclaimed June 20, 1862, this country places itself under obligations to Mexico to surrender to justice persons accused of enumerated crimes committed within the jurisdiction of Mexico who shall be found within the territory of the United States; and further provides that that obligation shall not extend to the surrender of American citizens. The treaty confers upon the President no affirmative power to surrender an American citizen. The treaty between the United States and Mexico creates an obligation on the part of the respective governments, and does no more, and where the obligation ceases the power falls. It is true that treaties are the laws of the land, but a statute and a treaty are subject to different modes of construction. If a statute by the first section should say, The President of the United States shall surrender to any friendly power any person who has committed a crime against the laws of that power, but shall not be bound so to surrender American citizens, it might be argued, perhaps correctly, that the President had a discretion whether he would or would not surrender an American citizen. But a treaty is a contract, and must be so construed. It confers upon the President only the power to perform that contract. I understand the treaty with Mexico as reading thus: The President shall be bound to surrender any person guilty of crime, unless such person is a citizen of the United States.

"Such being the construction of the treaty, and believing that the time to prevent a violation of the law of extradition was before the citizens left the jurisdiction of the United States, I telegraphed the Governor of Texas that an American citizen could not legally be held under the treaty for extradition.

"It would be a great evil that those guilty of high crime, whether American citizens or not, should go unpunished; but even that result could not justify an usurpation of power."

[13] Moore on Extradition, vol. I, p. 167.

many of our extradition treaties, was held to negative any obligation to surrender, and thus to leave the authorities of this government without authority to act in such a case. After due consideration, the department is of opinion that the construction given to the treaty in the *Trimble Case* is correct." See *Ex parte McCabe,* 4 Fed. 363, 379. Secretary Blaine, in 1891, in refusing to ask for the surrender of Mexican citizens, took the same position, saying: "In view of this," (the Trimble case) "and several prior and subsequent cases in which a similar construction has been given to the treaty, the government is precluded from demanding the extradition of the fugitives in the present instance." *Id.*

In this situation, the question of the construction of the treaty with Mexico came before the District Court of the United States for the Western District of Texas in 1891. Mrs. McCabe, an American citizen who was held for extradition proceedings on the charge that she had committed the crime of murder in Mexico, sued out a writ of *habeas corpus.* In an elaborate opinion reviewing the precedents, Judge Maxey ruled that there was no authority to surrender and directed her discharge from custody. *Ex parte McCabe, supra.* The case was not appealed.

In the light of this concurrence of administrative and judicial views a new extradition treaty with Mexico was negotiated (1899). That treaty, as we have seen, repeated the exception with respect to citizens but, following the precedent of the treaties with Japan, the Argentine Republic and the Orange Free State,[14] added the qualifying words "but the executive authority of each shall have the power to deliver them up, if, in its discretion, it be deemed proper to do so." And the same qualification was inserted in the later treaties above mentioned.[15]

---

[14] See Note 7.
[15] See Note 8.

Petitioners insist that the precedents fall short of showing a uniform course of practical construction favorable to the respondents. The argument is unavailing. What is more to the point is that administrative practice is not shown to be favorable to the petitioners. Strictly the question is not whether there had been a uniform practical construction denying the power, but whether the power had been so clearly recognized that the grant should be implied. The administrative rulings to which we have referred make the latter conclusion wholly inadmissible.

The treaty with France of 1843 made no exception of citizens. France, however, refused to recognize an obligation under that treaty to surrender her citizens.[16] In inserting the exception in the new treaty, a clause was chosen under which Secretaries of State and a federal court had held that the President had no discretionary power to surrender citizens of this country. Notwithstanding this, that excepting clause was inserted without qualification, and a familiar clause granting a discretionary power was omitted. No provision was inserted to confer such a power. It was upon that basis that the treaty was negotiated and ratified. In these circumstances we know of no rule of construction which would permit us to supply the omission.

Against these considerations, the inference sought to be drawn from the French "exposé des motifs" accompanying the treaty, and more particularly from the "exposé" accompanying the Franco-British treaty of 1908, is of slight weight.[17]

Petitioners strongly rely upon the decision in England in *In re Galwey* [1896], 1 Q. B. D. 230; compare *Reg.* v. *Wilson*, 3 Q. B. D. 42 (1877). But, as the Circuit Court

---

[16] Moore, Int. Law Dig., vol. IV, p. 298.

[17] Documents Parlementaires (1909), Chambre des Deputés, Annexe 2391; *Id.*, Sénat, Annexe 2338.

18

of Appeals points out, the Anglo-Belgian treaty there under consideration had its own history and background—quite different from that which we have here—upon which the case turned. It does not present a persuasive analogy.

Applying, as we must, our own law in determining the authority of the President, we are constrained to hold that his power, in the absence of statute conferring an independent power, must be found in the terms of the treaty and that, as the treaty with France fails to grant the necessary authority, the President is without power to surrender the respondents.

However regrettable such a lack of authority may be, the remedy lies with the Congress, or with the treaty-making power wherever the parties are willing to provide for the surrender of citizens, and not with the courts.

The decree of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE STONE took no part in the consideration or decision of this case.