**UNITED STATES of America,**

v.

**Olga Patricia CANCINO–PEREZ, Relator.**

**No. M 93–1041 (MDG).**

United States District Court,
E.D. New York.

Sept. 3, 1993.

Samuel I. Burstyn, Miami, FL (Nathan Dershowitz, of counsel), for relator.

Zachary W. Carter, U.S. Atty., E.D. New York, Brooklyn, NY by Christopher A. Nicolino, Asst. U.S. Atty., Murray Stein, U.S. Dept. of Justice, Washington, DC, for U.S.

## MEMORANDUM AND ORDER

GO, United States Magistrate Judge.

This proceeding brought under 18 U.S.C. § 3184 for the extradition of Olga Patricia Cancino–Perez to France has been referred to me for determination. Acting on the request of the Government of France, the United States seeks the extradition of relator pursuant to the Extradition Treaty between the United States and France signed on January 6, 1909 and entered into force on July 27, 1911, 22 U.S.T. 561, 37 Stat. 1526, as amended by the Supplementary Convention signed on February 12, 1970 and entered into force on April 3, 1971. 22 U.S.T. 407, T.I.A.S. 7075 (collectively called the "Treaty").

By letter dated July 26, 1993, the relator moved to be released from custody because of the failure of the United States to submit documentation required by the Treaty in a timely fashion. I denied this motion after a hearing held on August 3, 1993. However, because the relator had not had sufficient opportunity to examine the newly produced submissions of the United States, I gave the relator leave to submit additional legal arguments in support of her motion.

For the reasons stated below, I again deny relator's motion.

## BACKGROUND

On May 22, 1993, the United States initiated this proceeding by filing a complaint seeking the provisional arrest of Olga Patricia Cancino–Perez. Assistant U.S. Attorney Christopher A. Nicolino alleged in the complaint that the relator had been convicted *in absentia* of violating France's narcotics laws on February 22, 1990 by the District Court of Bobigny[1] and that the Government of

---

1. In his letter, Mr. Nicolino stated that French officials had advised that relator would be per-    mitted to reopen her case, but the documentary

France had formally requested her provisional arrest "with a view to her ultimate extradition to France." On May 28, 1993, I executed the complaint and issued an arrest warrant. After Ms. Cancino–Perez was arrested and brought before me on June 8, 1993, I ordered her held for further proceedings. At the request of her attorney, the hearing on her application for bail was held on June 10, 1993. I denied her request and ordered her continued to be held in custody.

On July 26, 1993, the attorney for relator sent via telecopier the letter motion for discharge on the ground that no documents required by the Treaty had been filed within the time limits specified. On July 29, 1993, the United States Attorney for the Eastern District submitted a letter forwarding a copy of a certification of Pamela Harriman, Ambassador to France, dated July 16, 1993, but did not at that time provide copies of the documents attached to the certification. Ambassador Harriman, in her certification entitled "Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition", certified that the annexed documents delivered by the French government "are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of France, as required by the Act of Congress of August 3, 1882." The supporting documents included a letter of transmittal to the "Procureur de la Republique", a document headed "Sentence" recording the court proceedings and providing vital statistics and the nature of the offenses of which Ms. Cancino–Perez was convicted, copies of provisions from the French Public Health Code and Customs Code, and English translations of the documents.

At a hearing held on August 3, 1993, the United States submitted the original certification of Ambassador Harriman with the supporting documents. In addition, it submitted a declaration dated July 30, 1993 of Thomas A. Johnson, Deputy Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, which included a copy of a diplomatic note dated July 26, 1993 from the French Embassy requesting the

extradition of Olga Patricia Cancino–Perez. Mr. Johnson stated in his declaration that the documents submitted by the French government to Ambassador Harriman on July 16, 1993 were properly certified in accordance with 18 U.S.C. § 3190 and the declaration, in turn, was duly authenticated by the Acting Secretary of State and Authentication Officer of the Department of State.

By letter dated August 5, 1993, the United States Attorney submitted a copy of a diplomatic note dated August 4, 1993 from the French Embassy which purportedly explains the sequence of events with respect to submission of documents required by the Treaty. The unofficial translation of the note reads as follows:

> The Embassy of France certifies that the request for extradition of Olga Patricia Cancino Perez was presented to the American authorities within the time frame allowed.

> The necessary documents were transmitted to the American Embassy in Paris on July 16, 1993, a procedure regarded as acceptable by the concerned American authorities.

> If the Note from the Embassy n° 325/DE is dated July 26, 1993, it is because it has been written right after the documents were received through the diplomatic pouch in Washington.

On August 30, 1993, the United States presented a certification of Ambassador Harriman dated July 22, 1993 forwarding a copy of the arrest warrant originally issued for the arrest of relator by the District Court of Bobigny, along with an English translation. The warrant had previously been submitted with the supporting documents delivered to Ambassador Harriman on July 16, 1993, but no translation had been provided.

### DISCUSSION

██ Extradition treaties must be construed liberally to achieve their purpose of providing for the surrender of fugitives for trial in the requesting country. *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936). "Form is not

certification to that effect has not yet been submitted.

to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *United States ex rel. Rauch v. Stockinger,* 269 F.2d 681, 687 (2d Cir.), *cert. denied,* 361 U.S. 973, 80 S.Ct. 584, 4 L.Ed.2d 553 (1959). In addition, a court must give "much weight" to the construction of a treaty by the political department of the government. *Charlton v. Kelly,* 229 U.S. 447, 468, 33 S.Ct. 945, 952, 57 L.Ed. 1274 (1913).

■■■ The last paragraph of Article IV of the Treaty provides:

the person provisionally arrested shall be released, unless within forty days from the date of arrest in France, or from the date of commitment in the United States, the formal requisition for surrender with the documentary proofs herein before prescribed be made as aforesaid by the diplomatic agent of the demanding government or, in his absence, by a consular officer thereof.

The relator claims that she is entitled to be released because the formal requisition and documentary proofs were not submitted within the forty-day period prescribed by the Treaty, which expired on July 19, 1993.[2] Specifically, she argues that the submission by the United States on July 29, 1993 of documents received by Ambassador Harriman from the French Government on July 16, 1993 was not timely[3] and that no "formal requisition for surrender" was made until July 26, 1993 when France made a formal request in a diplomatic note to the United States.

As a threshold matter, it is necessary to define the "date of commitment" and "formal requisition". Most courts interpreting similar provisions in other treaties have interpreted "date of commitment" to mean "the date on which a fugitive is arrested for the sole purpose of extradition." *In re Chan Kam–Shu,* 477 F.2d 333, 339 (5th Cir.), *cert. denied,* 414 U.S. 847, 94 S.Ct. 112, 38 L.Ed.2d 94 (1973) (interpreting analogous provision of extradition treaty with Liberia); *Jimenez v. Aristeguieta,* 311 F.2d 547, 564 (5th Cir.), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1962) (treaty with Venezuela); *Voloshin v. Ridenour,* 299 F. at 137–38 (treaty with Chile).

■■■ However, the plain language of the Treaty specifies that the 40–day period commences from the "date of arrest" only if the arrest is secured in France. If the fugitive is found in the United States, the time period is measured from "the date of commitment," rather than date of arrest. *Galan Valencia v. Scott,* No. CV 90–3745, 1992 WL 75036, *4 (E.D.N.Y. March 24, 1992). After further consideration and review of the Treaty, I find that the only logical meaning for "date of commitment" must be the date (after arrest) that a judicial determination is made to commit the arrested fugitive for an extradition hearing.[4]

---

**2.** While the relator deems the forty-day provision as jurisdictional and argues that the French government's failure to comply with it must result in her release, citing *Ex Parte Reed,* 158 F. 891 (D.N.J.1908), there is no provision in the treaty preventing her rearrest. *See Voloshin v. Ridenour,* 299 F. 134 (5th Cir.1924) ("[i]n the absence of such a provision in the applicable treaty successive provisional arrests and detentions are permissible ...."). In fact, a note at the conclusion of the opinion in *Reed* indicates that a new complaint and warrant were issued and that "[u]nder this warrant the prisoner was rearrested, a hearing had, a motion to dismiss the proceedings refused, and the prisoner committed for extradition." 158 F. at 894. Thus, even if relator were to prevail on this motion, the United States could seek her rearrest pursuant to a new complaint and warrant.

**3.** Relator had initially argued that none of the documents required by the Treaty had been sub-

mitted at all, since she was not aware of the service of documents upon Ambassador Harriman. The date that documentation is received by the American Embassy, rather than the date of submission to the court, is the only relevant date for purposes of determining compliance with documentation requirements under extradition treaties. *See United States v. Wiebe,* 733 F.2d 549, 554 (8th Cir.1984); *United States v. Clark,* 470 F.Supp. 976, 979 (D.Vt.1979).

**4.** This interpretation is supported by the French version of the Treaty which uses the term *"mandat de dépôt"* in place of "commitment." In French, the clause clearly contemplates a judicial determination to hold in custody. *See* definition of *"mandat de dépôt"* under *"Dépôt"* in *Le Petit Robert: ordre du juge d'instruction pour faire incarcérer un prévenu."*

In this case, there is no difference between the date of arrest and the date of commitment. Ms. Cancino–Perez was arrested on June 8, 1993 and, when brought to court, was ordered held for further proceedings. The forty-day period commenced on this date and ended on July 19, 1993.

The Treaty does not specify what constitutes a "formal requisition for surrender" other than to note at the beginning of Article III that it "shall be made by the diplomatic agents of the contracting Parties...." There is no useful case law defining a "formal requisition" under the Treaty and other extradition treaties.

One commentator has noted that:

there are no specific requirements in the various laws and treaties as to the form and content of the formal extradition request. Such requirements as are spelled out usually relate to the documents accompanying the request.... Normally the extradition request is in writing (in the form of a diplomatic note) and contains the name of the accused, information as to his whereabouts in the requested State, and specification of the crime or crimes for which his extradition is requested with reference to the applicable extradition treaty or law.

6 Marjorie M. Whiteman, *Digest of International Law*, at 906 (1968); *see also* M. Cherif Bassiouni, *International Extradition: United States Law and Practice*, IX § 2–5 (1983) ("At the executive level the requisition is a formal diplomatic request, even though there is no specific form for it, except that it must be addressed to the Secretary of State.")

■ The documents submitted to Ambassador Harriman on July 16, 1993 meet the most important factors spelled out above: they contain the name, whereabouts, and crime of the accused. While they were not in the form of a diplomatic note and not addressed directly to the Secretary of State, they were submitted to the Ambassador to France, an agent of the Secretary of State. Furthermore, not only has the United States taken the position that they are acceptable, but the diplomatic note dated August 5, 1993 indicates that the submissions were made in accordance with procedures approved by the Department of State. The forty-day provision has been interpreted by courts as protecting the interests of the asylum country as well as respondents, and for that reason, the acceptance of a request by the asylum country should be treated with deference. *United States v. Clark*, 470 F.Supp. at 979 ("the purpose of the ... provision is to protect the asylum country and respondents in its custody from custodial burdens and deprivations due to foot-dragging on the part of the demanding country").

Moreover, in *Charlton v. Kelly*, 229 U.S. 447, 464, 33 S.Ct. 945, 950, 57 L.Ed. 1274 (1913), the Supreme Court held that the provision in the extradition treaty with Italy concerning a formal demand, "[c]onstrued in light of the original and supplementary conventions with Italy, and of § 5270 [the precursor to 18 U.S.C. § 3184]," [5] did not require "that the 'formal demand' referred to in the 1884 clause should be proven in the preliminary proceeding within forty days after the arrest." The Court determined that "that is a demand made upon the executive

**5.** The current section 3184, which is substantially similar to section 5270, applied in *Charlton*, provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person to charged, that he

may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

authority of the United States by the executive authority of Italy. Its presentation was not necessary to give the examining magistrate jurisdiction."

The Supreme Court's holding derived from its interpretation of both the extradition treaty with Italy and section 5270, the relevant statute:

What is referred to by the phrase 'the requisition, together with the documents above provided,' etc., which is required to be made within forty days, or the person set at liberty? The 'certificate' attesting 'that a requisition has been made,' etc., was 'exhibited' to Judge Blair; and we fail to find in this clause of the treaty any requirement that the subsequent 'formal demand' for the extradition shall be filed with [the] magistrate within forty days after the arrest of the accused, or at any other time. The whole of the convention should be read together and in connection with § 5270, Revised Statutes, which is applicable to all treaties. Under § 5270, any one of the judicial officers named therein may, upon complaint, charging one of the crimes named in the treaty, issue his warrant of arrest and hear the evidence of criminality. This done, his duty is, if he deems the evidence sufficient to hold the accused for extradition, to commit him to jail, and to certify his conclusion, with the evidence, to the Secretary of State, who may then 'upon the requisition of the proper authorities of such foreign government, issue his warrant for the surrender of the accused.' ... Of course, the effect of the supplementary treaty of 1884, being later than the statutory requirements above referred to, is to supersede the statute in so far as there is a necessary conflict in the carrying out of the extradition obligation between this country and Italy. But, as observed in *Grin v. Shine,* 187 U.S. 181, 191, 23 Sup.Ct.Rep. 98[, 102], 47 L.Ed. 130, 136, 12 Am.Crim.Rep. 366, 'Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient. *Castro v. De Uriarte,* 16 Fed. 93. This appears to have been the object of § 5270, which is applicable to all foreign governments with which we have treaties of extradition.'

*Id.* 229 U.S. at 463–64, 33 S.Ct. at 950. The holding of the Supreme Court in *Charlton* indicates that, at least with respect to the formal requisition, statutory law can take precedence over treaty. Thus, even if the submission of July 16 did not meet the requirements of a formal requisition under the Treaty, it still was sufficient notice to the United States government under federal extradition law.

■ Relator also argues that the arrest warrant had not been submitted in a timely fashion. However, the arrest warrant originally issued for the arrest of the relator was among the documents submitted to Ambassador Harriman on July 16. Even if it were not, the initial failure to submit is not critical since Article III of the Treaty requires only an authenticated copy of the sentence where the relator has already been convicted.

### CONCLUSION

Relator's motion for release from custody due to the alleged failure to make timely submissions under the Treaty is denied.

SO ORDERED.