Mariano Cabrera DURAN., Petitioner,

v.

UNITED STATES of America, Madeline Albright, Secretary of State, and Kathleen M. Hawk Sawyer, Director of the Federal Bureau of Prisons, Respondents.

No. 99 Civ. 0643 (LAK).

United States District Court,
S.D. New York.

Feb. 18, 1999.

**MEMORANDUM OPINION**

KAPLAN, District Judge.

Petitioner Mariano Cabrera Duran currently is incarcerated on a provisional arrest warrant sought by the United States in anticipation of a request that he be extradited to the Dominican Republic. He seeks a writ of habeas corpus, arguing that he has been held longer than the pertinent statute permits. In the alternative, he seeks release on bail.

*Facts*

Almost twenty-four years ago, a journalist named Luis Orlando Martinez Howley was shot and killed in Santo Domingo, Dominican Republic.[1] At the time he was killed, Howley was a critic of the policies of then president Joaquin Balaguer,[2] and his killing is believed to have been politically motivated. President Balaguer left office in 1996 amid allegations of human rights abuses and corruption.[3] Several lawsuits have accused him of ordering the killing of political opponents including Mr. Howley.[4]

At the time of the Howley murder, petitioner was a member of the Dominican Air Force.[5] He later retired from the Air Force, left the Dominican Republic, and settled in the United States.[6] He currently operates a liquor store in the Bronx.[7]

The government of the Dominican Republic now seeks to prosecute Duran for the Howley killing. Its efforts to do so have gained momentum only in the last two years. The witness statements, for example, upon which the government relies were taken in 1997, twenty-two years after the crime.[8] Duran fears that the Dominican government "seeks to extradite [him] in order to subject him to a political trial in a [*sic*] connection

Antonio Claudio Martinez, Law Offices of Antonio Martinez, New York City, for petitioner.

Marc A. Weinstein, Assistant United States Attorney, Mary Jo White, United States Attorney, New York City, for respondents.

1. Cpt. ¶ 6c, 98 Crim.Misc. 1 ("Cpt.").

2. Martinez Aff. ¶ 12.

3. Anthony Ramirez, *Bronx Store Owner is Arrested in a 1975 Dominican Killing,* N.Y.Times, December 1, 1998, at B5.

4. *Id.*

5. Cpt. ¶ 6b.

6. Martinez Aff. ¶¶ 7, 15.

7. *Id.* at ¶ 15.

8. Cpt. at ¶ 6g.

with the political death of Mr. Martinez Howley."[9]

On November 28, 1998, the United States Attorney's Office filed a complaint for the provisional arrest of Duran with a view toward extradition.[10] It did so at the request of the Dominican Republic, which had asked through diplomatic channels that Duran be arrested with a view toward extradition.[11] Magistrate Judge Peck signed the arrest warrant and petitioner was arrested on the same day.[12] He did not appear before a magistrate judge, however, until November 30, when bail was denied and he was ordered detained.[13] On January 11, 1999, the State Department received a formal request for extradition. On January 28, 1999, the government filed the formal request and supporting documents with the Court.[14]

## Discussion

### Extradition Generally

The process of extradition is governed by Title 18, United States Code, Sections 3181 through 3196 and typically bilateral treaties with foreign nations. In broad outline, the extradition process is as follows.[15] A foreign country requests that the United States extradite a defendant. In order to avoid the flight of a defendant during preparation of a full formal request, many extradition treaties permit a provisional arrest to be made upon receipt of an informal request.[16] Provisional arrest requires minimal proof but must be followed by submission of a formal extradition request and more complete evidence soon afterward.

After evaluation and approval by the State Department, the necessary papers are forwarded to the appropriate United States Attorney. The United States Attorney files a complaint and seeks a warrant from a judge or a magistrate judge to arrest the defendant. If the warrant issues, a hearing must be held to determine "[i]f, on such hearing [the judge or magistrate judge] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b)."[17] If so, the judge

> "shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention."[18]

Neither the government nor the defendant may appeal directly from a judicial determination on certification,[19] although the government is free to renew a request for extradition that has been denied.[20] The only avenue for a defendant to attack a court's certificate to the Secretary of State is a petition for a writ of habeas corpus.

### Time Limits on Detention Pending Extradition

In this case, there are two limitations on the time petitioner may be detained during the extradition process.

### 1. The Limit in the Treaty

■ Two articles of the extradition treaty between the United States and the Domini-

9. Martinez Aff. ¶ 13.

10. See Cpt.

11. See id. ¶¶ 1, 4.

12. Pet. ¶ 9, Govt.Mem. at 2.

13. Criminal Miscellaneous Docket Sheet, 98 Crim.Misc. 1 pg 24.

14. Govt.Mem. at 3.

15. See generally Eain v. Wilkes, 641 F.2d 504, 508 (7th Cir.), cert. denied, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

16. See M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION. UNITED STATES LAW AND PRACTICE 676–88 (3d ed.1996)

17. 18 U.S.C. 3184 (1985 & Supp.1998).

18. Id.

19. Collins v. Miller, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920); Eain v. Wilkes, 641 F.2d at 508.

20. See Collins v. Loisel, 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923).

can Republic (the "Extradition Treaty")[21] are relevant here: Article XI describes the request for extradition, and Article XII outlines the process once an accused has been arrested in the country from which extradition is sought. Both articles clearly contemplate provisional arrests. Article XI states that "[i]t shall be competent for ... diplomatic or superior consular officers to ask for and obtain a mandate or preliminary warrant of arrest."[22] Article XII speaks of a "preliminary warrant of arrest ... issued in pursuance of a request or declaration received by telegraph from the government asking for the extradition."[23]

The Extradition Treaty requires that once a person has

"been arrested ... [on a] preliminary warrant of arrest ... and been brought, before a judge or magistrate to the end that the evidence of his or her guilt may be heard and examined as herein before provided ... it shall be competent for the judge or magistrate at his discretion to hold the accused for a period not exceeding two months, so that the demanding Government may have opportunity to lay before such judge or magistrate the guilt of the accused, and if, at the expiration of said period of two months, such legal evidence shall not have been produced before such judge or magistrate, the person arrested shall be released, provided that the examination of the charges preferred against such person shall not be actually going on."[24]

In other words, the demanding government, the Dominican Republic in this case, has two months from provisional arrest to lay before a court evidence of the guilt of the accused. While they cut it rather close, the Court is convinced the time limit was met here.

The treaty is far from clear about precisely how the two month period should be measured. First, it is unclear when the two month period begins. At the earliest, it begins at arrest, here November 28, 1998. The treaty, however, speaks of a defendant arrested "and ... brought, before a judge or magistrate to the end that the evidence of his guilt may be heard or examined."[25] This language suggests that an appearance before a judge may be required before the two month time clock begins and that November 30, the day of petitioner's initial appearance, would be the appropriate starting date.

Second, it is unclear how to count the two months allowed by the treaty. The most natural reading is to count by calendar months, i.e., one month from January 1 is February 1.[26] Petitioner suggests instead that the one month period should include the beginning day, and thus end a day earlier, in which case one month from January 1 is January 31. The government, in a third variation, suggests that the Court compensate for the short (less than 31 day) month involved in this case by extending the deadline.

Finally, it is unclear precisely what event stops the two month treaty clock. The government urges a general rule that "the appropriate date by which to consider whether an extradition treaty request is timely is the date on which the requesting country submitted the request through diplomatic channels

**21.** Treaty Between the United States and the Dominican Republic on Extradition, signed June 19, 1909, 36 Stat. 2468, 1910 WL 4471.

**22.** Article XI, Extradition Treaty.

**23.** Article XII, Extradition Treaty. Although this phrase refers literally only to requests received by telegraph, it must be read in the context of its time. The treaty was signed in 1909, when the only means of making an expedited request from the Dominican Republic to the United States likely was by telegraph. The reference thus encompassed all expedited requests, and while the means of making such requests have multiplied, the Court reads this phrase to refer to any expedited request for a provisional warrant.

**24.** *Id.*

**25.** *Id.*

**26.** While not controlling authority, the Court notes that New York state courts count calendar months when construing the state six-month speedy trial limitation. *See People v. Allen*, 172 A.D.2d 542, 568 N.Y.S.2d 132, 134 (2d Dept. 1991); *People v. Jones*, 105 A.D.2d 179, 483 N.Y.S.2d 345, 352 (2d Dept.1984). Neither party has supplied any authority for a different approach.

to the asylum country." [27] This would eliminate any dispute over timing in this case, since the United States received the initial formal diplomatic request from the Dominican Republic on January 11, 1999,[28] well within the two month period, however it is construed. It relies upon *Bozilov v. Seifert*,[29] *United States v. Wiebe*,[30] and *United States v. Clark*.[31] These case, however, all construed treaties which provided that a detainee should be set free "upon the expiration of [a fixed number of] days ... *if a request for his extradition ... shall not have been received.*" [32] They therefore are inapposite here because the Extradition Treaty in this case differs materially. It requires that within two months the demanding country "*lay before [a] judge or magistrate the guilt of the accused*, and if, at the expiration of said period of two months, such legal evidence shall not *have been produced before such judge or magistrate*, the person arrested shall be released...." [33] In consequence, the government's argument is at odds with the plain language of the treaty.

The Court is aware of the policy consideration animating *Wiebe*, *Bozilov* and *Clark*, viz. the protection of the demanding country from the burdens of foot dragging on the part of the country detaining the extraditee. Nonetheless, the plain language of the Extradition Treaty governing this case is clear that the demanding country must put evidence before a judge or magistrate within two months. In this case, evidence was put before the Court on January 28, 1999, with the filing of the formal extradition request and supporting documents.

■ The Court assumes *arguendo* that the date most favorable to petitioner, his arrest

on November 28, 1998, began the two month time period described in the treaty. Counting by calendar months, the two month period ended on January 28, 1999. In order to satisfy the treaty, the government had to put evidence before a judge or magistrate by that date. They did so by filing a formal request, supported by evidence, on January 28, 1999, with this Court. The treaty thus was satisfied. This conclusion only is strengthened by the oft-cited principle that extradition treaties are to be construed liberally to effect the surrender of fugitives.[34]

### 2. The Statutory Limit

■ Since petitioner was arrested and detained lawfully under the Extradition Treaty, he now awaits a hearing. At the hearing, a judge or magistrate will examine the evidence and, in accord with Section 3184, determine "[i]f ... the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty or convention." [35] If so, the judge will so certify to the State Department, which will decide whether to extradite the petitioner.

Duran argues that he is entitled to his freedom under 18 U.S.C. § 3188 because he has been in custody for over two calendar months without being delivered for extradition.[36] But he misreads the statute.

Section 3188 says that

"[w]henever any person who is committed for rendition to a foreign government to remain until delivered up in pursuance of a requisition, is not so delivered up and conveyed out of the United States within two calendar months after such commitment ... any judge of the United States ...

**27.** Govt.Mem. at 4.

**28.** *See id.*

**29.** 983 F.2d 140 (9th Cir.1992).

**30.** 733 F.2d 549 (8th Cir.1984).

**31.** 470 F.Supp. 976 (D.Vt.1979).

**32.** *U.S. v. Wiebe*, 733 F.2d at 551 (citing extradition treaty with Spain) (emphasis added); *see also Bozilov v. Seifert*, 983 F.2d at 143 ("[t]he German Treaty provision is identical to the one approved in *Wiebe*."); *U.S. v. Clark*, 470 F.Supp.

at 978 (citing same language in extradition treaty with Canada).

**33.** Article XII, Extradition Treaty (emphasis added).

**34.** *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936).

**35.** 18 U.S.C. § 3184 (1985 & Supp.1998).

**36.** Pet. ¶ 10. On January 21, 1999, petitioner gave the notice to the Secretary of State which is required to invoke Section 3188. Pet. ¶ 11.

upon application made to him [or her] by or on behalf of the person so committed, and upon proof to him [or her] that reasonable notice of the intention to make such application has been given to the Secretary of State, may order the person so committed to be discharged out of custody, unless sufficient cause is shown to such judge why such discharge ought not to be ordered." [37]

Petitioner is in custody on a provisional arrest warrant. He awaits a hearing to determine whether he is extraditable under the applicable treaty. He is not yet "committed for rendition to a foreign government." His invocation of Section 3188 therefore is premature, as the statutory time limit does not begin to run until an individual is certified as extraditable. In other words, it "runs from the time [petitioner's] claims are finally adjudicated." [38]

■ The case most clearly illustrating the operation of Section 3188 is the Sixth Circuit decision in *Barrett v. United States*.[39] There, the potential extraditee was arrested at the request of Canadian authorities on August 30, 1977. On December 15, 1977, a magistrate found probable cause sufficient to establish the charge and ordered the defendant held for extradition. Not until January 11, 1978, however, did the magistrate sign the certificate of extradition and order of commitment. The Sixth Circuit held that "the two month time limitation began to run when the Magistrate entered an order on January 11, 1978, committing appellant to jail to await extradition." [40] And the law in this Circuit is precisely the same.[41]

Petitioner suggested at oral argument that he is unprotected at this time from a lengthy period of detention, and unfairly so. The short answer is that any unfairness is a result of a gap in the patchwork of treaty and statutory protections. Petitioner was pro-

tected by the treaty time limit while he awaited submission of a formal extradition request. He will be protected by Section 3188 if he is certified for extradition and his case has been adjudicated finally. There simply is no separate statutory protection for the time between formal request and final adjudication.[42]

A fuller answer is that any delay during this time period stems from judicial review of the extradition request under Section 3184. That review is conducted for petitioner's protection, and he has voiced no desire to waive it. Moreover, any other scheme, at least with respect to Section 3188, would be untenable. As Mr. Justice Goldberg pointed out in *Jimenez v. United States District Court*,[43] the clock can begin to run only after petitioner's rights have been adjudicated fully. If it began earlier, for example at arrest, either the petitioner or the government inevitably would be frustrated. In just the two months after arrest, petitioner could not have an extradition hearing, pursue a writ of habeas corpus, and if necessary seek and obtain review of the habeas decision. At the same time, in two months the government would have insufficient time to extradite a defendant who had first pursued the process of judicial review. In nearly every extradition, if the Section 3188 clock began at arrest, either the petitioner would be foreclosed from seeking review or the government would run out of time to extradite.

### Bail

When petitioner originally appeared before the magistrate judge, his application for bail was denied and he was detained. He has moved for reconsideration of that denial.

■ Bail is available in extradition cases, despite the lack of any statutory basis for it,

---

**37.** 18 U.S.C. § 3188 (1985 & Supp.1998).

**38.** *Jimenez v. United States District Court*, 84 S.Ct. 14, 18, 11 L.Ed.2d 30 (1963) (Goldberg, J. in chambers).

**39.** 590 F.2d 624 (6th Cir.1978).

**40.** *Id.* at 626.

**41.** *See Liberto v. Emery*, 724 F.2d 23, 25 n. 2 (2d Cir.1983) ("the two-month period does not begin

to run until there has been a final adjudication of the extradition request").

**42.** The Court need not address the question whether the Due Process Clause at some point limits the duration of custody pending proceedings related to an extradition request.

**43.** 84 S.Ct. 14, 18, 11 L.Ed.2d 30 (1963).

as the Supreme Court in *Wright v. Henkel*[44] commented that it was "unwilling to hold that the Circuit Courts possess no power in respect of admitting to bail other than as specifically vested by statute," [45] although the court noted also that "bail should not ordinarily be granted in cases of foreign extradition." [46] The United States must be able to fulfill its treaty obligations.[47] It must be ready to surrender an accused in the circumstances agreed or fear having its own requests for fugitives go unheeded. Hence, as Judge Learned Hand put it in *In re Mitchell*,[48] bail may be granted in extradition cases only when "special circumstances" exist.[49]

 In this case, petitioner has significant ties to the community. Nevertheless, he faces a term of imprisonment, should he be extradited and convicted, which may outlast his remaining years of life. He thus has a significant incentive to flee, an incentive compounded by his express belief that the Dominican prosecution is a political rather than an impartial judicial proceeding. At least at this early stage, where there is no reason to expect extensive delays pending an extradition hearing, the Court is not persuaded that special circumstances sufficient to justify bail are present.[50]

*Conclusion*

For the foregoing reasons, Duran's petition for a writ of habeas corpus is dismissed without prejudice as premature. The application for bail is denied.

SO ORDERED.

---

44. 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903).

45. *Id.* at 63, 23 S.Ct. 781.

46. *Id.* at 63, 23 S.Ct. 781.

47. *Id.* at 62, 23 S.Ct. 781.

48. 171 F. 289 (S.D.N.Y.1909)

49. *Id.* at 290.

50. *See United States v. Leitner,* 784 F.2d 159 (2d Cir.1986) (affirming denial of bail when there were allegations of a violent crime and a risk of flight).