TALLMAN, Circuit Judge,
with whom Circuit Judges CLIFTON, M. SMITH, and IKUTA join, dissenting:
Hedelito Trinidad y Garcia, a Philippine national, stands accused by the Philippines of kidnaping for ransom. After Philippine authorities requested his extradition so that he might stand trial there for his crime — a request reviewed and approved by the Departments of State and Justice— he was arrested in Los Angeles. Five years later, after his claims were denied by two different courts, then Secretary of State Condoleeza Rice ordered Trinidad extradited.
We went en banc to address a relatively straightforward legal question: whether an extraditee like Trinidad may challenge the Secretary of State’s decision to extradite him based on the conditions he expects to face upon return to the requesting country. Like the Supreme Court, I believe the answer to be equally straightforward: no. I am not alone. A majority of us agree that the Rule of Non-Inquiry applies and precludes Trinidad from obtaining judicial review of the substance of the Secretary’s decision. And, to the extent we have previously provided for greater review or relief, e.g., Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1012 (9th Cir.2000), “we overrule that precedent.” Per Curiam at 957. Unfortunately, that is where our agreement ends.
Seizing on a concession the United States offered only for future cases and only if we found it legally necessary, some of my colleagues now find reason to doubt the undoubtable, worrying whether the Secretary ever made a torture determination at all. See id. at 963-64. They brush aside the fact that Trinidad himself had no reason to doubt the reality of the Secretary’s decision — the decision that prompted Trinidad to bring his habeas claim, the district court to rule on it, the government to appeal, and two separate panels of this court to consider the matter — recharacterizing his disagreement with the outcome of her decision as a dispute over the process she employed. Id. Worse, they ignore a litany of firmly established legal principles — not the least of which being our presumption that constitutional officers properly discharge them legal duties — to achieve an unfathomable end and further delay an extradition that has already lumbered along for close to a decade.
I cannot question so lightly the honor of the Secretary or depart so readily from *963 governing case law. The Secretary has made her decision, and neither the Convention Against Torture (“Convention”), the Foreign Affairs Reform and Restructuring Act of 1998 (“FARR Act”),[1] nor the controlling regulations, 22 C.F.R. §§ 95.1-95.4, give us cause to inquire further. The Rule of Non-Inquiry squarely applies, and our inquiry is at an end. As the Supreme Court directed in Munaf v. Geren, 553 U.S. 674, 692, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), there is nothing left for us to do but order Trinidad’s habeas petition promptly dismissed so that he may finally be extradited, and I dissent to the extent we conclude any differently.
I
Though I write predominately to explain in full detail why remand is so utterly unnecessary, I also believe we do the en banc process and the litigants a disservice by not more fully explaining why the Rule of Non-Inquiry precludes us from according Trinidad relief and why neither the FARR Act nor 8 U.S.C. § 1252(a)(4) deprives us of jurisdiction. I therefore address not only the reason for my dissent, but also explain my understanding of the law undergirding those issues on which we agree. Furthermore, I endeavor to correct the liberties some of my concurring colleagues have taken with both the law and the record.
A
Trinidad raises two distinct rationales for why he may not be extradited. First, he contends that he may “invoke the writ to challenge the Secretary’s decision to surrender him in violation of his substantive due process right to be free from torture” at the hands of a foreign government. Gov’t Brief at 65. He argues that the Supreme Court has yet to address “whether handing over an individual to a country where he would face the prospect of torture violates substantive due process,” but has intimated that it might. Id. at 67. Alternatively, he asserts that even in the absence of a constitutionally protected interest to be free from the specter of foreign torture, he possesses a statutory right under the Convention and the FARR Act that precludes the United States from extraditing him to a country where torture is “more likely than not” to occur. Cf. § 95.2. He argues that these provisions confer a non-discretionary, mandatory obligation upon the Executive to decline to extradite him without first demonstrating to a court’s satisfaction that it is not “more likely than not” that he will face torture there.
Trinidad’s first claim is readily dispatched. Contrary to his suggestion, he is not the first to raise such a claim; nor would he be the first to have that claim denied. E.g., Neely v. Henkel, 180 U.S. 109, 123, 125, 21 S.Ct. 302, 45 L.Ed. 448 (1901) (“The court below having found that there was probable cause to believe the appellant guilty of the offenses charged, the order for his extradition was proper, and no ground existed for his discharge on habeas corpus.”); Lopez-Smith v. Hood, 121 F.3d 1322, 1325-26 (9th Cir.1997). Long ago, the Court established that ex-traditees may not oppose their extraditions on the ground that the law of the receiving country does not provide them the full panoply of rights guaranteed them by the Constitution of the United States. Munaf, 553 U.S. at 696-97, 128 S.Ct. 2207 (discussing Neely).
*964 In Neely, for example, the Court concluded that though the Constitution guarantees an individual a broad range of “rights, privileges, and immunities” against the United States government, including the right to be free from torture, Baze v. Rees, 553 U.S. 35, 48, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality-opinion), those provisions had no effect “against the laws of a foreign country.” 180 U.S. at 122-23, 21 S.Ct. 302 (“Allusion is here made to the provisions of the Federal Constitution relating to the writ of habeas corpus, bills of attainder, ex post facto laws, trial by jury for crimes, and generally to the fundamental guaranties of life, liberty, and property embodied in that instrument. The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.”). As recently explained in Munaf, the Court “summarily rejected this claim” because “Neely alleged no claim for which a ‘discharge on habeas corpus ’ could issue.” 553 U.S. at 696, 128 S.Ct. 2207 (quoting Neely, 180 U.S. at 125, 21 S.Ct. 302).
[Citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled. When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.
Neely, 180 U.S. at 123, 21 S.Ct. 302 (emphasis added); accord Munaf, 553 U.S. at 695, 128 S.Ct. 2207. “ ‘[T]he same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such nonreviewable adjudications.’ ” Munaf, 553 U.S. at 698-99, 128 S.Ct. 2207 (citation omitted).
Trinidad’s second claim is not so easily resolved, however. As the Court recognized in Valentine, the Executive does not possess plenary power to extradite. Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 8-9, 57 S.Ct. 100, 81 L.Ed. 5 (1936) (“[T]he Constitution creates no Executive prerogative to dispose of the liberty of the individual.”). Accordingly, extradition proceedings “must be authorized by law” and comport with pertinent statutory limits.[2] Id. at 9, 57 S.Ct. 100 (“There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law.”); accord Munaf, 553 U.S. at 704, 128 S.Ct. 2207 (quoting Valentine, 299 U.S. at 8-9, 57 S.Ct. 100). Thus, Trinidad is correct insofar as he argues that we must determine whether any of the pertinent statutory limits on which he relies actually limit Executive authority under the relevant treaty.[3]
*965 Trinidad misjudges the effect of that inquiry, however. Even were we to agree that either the Convention, the FARR Act, or the regulations limit Executive authority, it does not necessarily follow that the scope of our habeas review would grow in kind. See, e.g., Oteiza v. Jacobus, 136 U.S. 330, 334, 10 S.Ct. 1031, 34 L.Ed. 464 (1890) (“A writ of habeas corpus in a case of extradition cannot perform the office of a writ of error.”). Rather, because the Rule of Non-Inquiry remains, these limits would only establish the concerns that might be cognizable on habeas review. See id.; see also Munaf, 553 U.S. at 693, 128 S.Ct. 2207 (“The principle that a habeas court is ‘not bound in every case’ to *966 issue the writ ... follows from the precatory language of the habeas statute, and from its common-law origins.”); Neely, 180 U.S. at 123, 21 S.Ct. 302. It is only when Congress pairs a limitation on the Secretary’s extradition authority with an express invitation for judicial review that the Rule of Non-Inquiry retracts to permit that review. See Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); Neely, 180 U.S. at 123, 21 S.Ct. 302; see also Munaf, 553 U.S. at 702-03, 128 S.Ct. 2207. Compare 18 U.S.C. § 3184[4] (statute authorizing extradition under specified conditions), with Barapind v. Reno, 225 F.3d 1100, 1105 n. 4 (9th Cir.2000) (noting the six extradition-related questions cognizable on habeas review). Three cases — Neely, Oteiza, and Fernandez — aptly demonstrate this point.
As Neely discusses, near the turn of the twentieth century, the statutory extradition framework was codified at § 5270 of the United States Revised Statutes of 1878 — a precursor to the United States Code. As originally enacted, that statute placed little to no restriction on the Executive’s extradition authority. It required only that there be “a treaty or convention for extradition between the government of the United States and [the] foreign government” and that the official authorizing extradition have jurisdiction over both the request and the person of the accused. Neely, 180 U.S. at 110-11, 21 S.Ct. 302 (emphasis omitted) (quoting § 5270); accord Oteiza, 136 U.S. at 334, 10 S.Ct. 1031. If these conditions were met, Congress left to the extraditing official the decision whether “the evidence [was] sufficient to sustain the charge under the provisions of the treaty.” Oteiza, 136 U.S. at 334, 10 S.Ct. 1031. Accordingly, in Oteiza the Court summarized the habeas jurisdiction of reviewing courts as follows:
If the commissioner has jurisdiction of the subject-matter and of the person of the accused, and the offense charged is within the terms of a treaty of extradition, and the commissioner, in arriving at a decision to hold the accused has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such deci *967 sion of the commissioner cannot be reviewed by a circuit court or by this court, on habeas corpus, either originally or by appeal.
Id. (emphasis added). In short, habeas review extended no further than the explicit terms of judicial review authorized by the statute. Even though the statute limited the Executive’s authority, the statute did not explicitly authorize review of the Executive’s decision and thus the Court declined to second-guess the commissioner’s self-professed adherence. See id.; accord Munaf, 553 U.S. at 702, 128 S.Ct. 2207.
Notably, however, the scope of what was cognizable on habeas review began to expand in 1900 when Congress amended § 5270 to require, among other things, a judicial determination of probable cause before the Executive could lawfully extradite.[5] Neely, 180 U.S. at 111, 21 S.Ct. 302. Thus, in the post-amendment case of Fernandez, the Court concluded that the writ extended to “whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.” 268 U.S. at 312, 45 S.Ct. 541 (emphasis added). And, unlike in Oteiza, the Fernandez Court delved into the facts to make an independent legal determination of probable cause, id. at 313-14, 45 S.Ct. 541 (“We are of opinion that probable cause to believe the defendant guilty was shown by competent evidence and that the judgment remanding the appellant must be affirmed.”), as required by the amendment to § 5270 — an inquiry we still undertake today.
In sum, what these cases demonstrate is that the scope of our habeas review in the extradition context wholly depends on the will of Congress. The judiciary participates in the extradition process only by congressional invitation, Neely, 180 U.S. at 123, 21 S.Ct. 302, and thus our power extends no further than the bounds of that invitation. See Munaf, 553 U.S. at 702-03, 128 S.Ct. 2207; Oteiza, 136 U.S. at 334, 10 S.Ct. 1031. When, as under the 1890 form of § 5270, Congress prefers that the courts play a minimal role, our review is just that, minimal. As Oteiza demonstrates, it may be as minute as deciding whether jurisdiction and an authorizing treaty exist, 136 U.S. at 334, 10 S.Ct. 1031 — questions on which Trinidad has already received all the habeas review to which he is entitled. However, as the contrast between Oteiza and Fernandez demonstrates, when Congress requires that we play a greater role, the Rule’s “hands-off’ practice is abrogated to the extent Congress directs.[6]
We must therefore evaluate the Convention, the FARR Act, and the regulations to ascertain whether, as it did when it amended § 5270 in 1900, Congress has extended a broader invitation. We must first consider whether any of these provisions actually binds the Executive’s statutory authority. Moreover, as Oteiza demonstrates, even if any of these provisions actually limits Executive authority, we must further determine whether Congress intended for the judiciary to have a role in *968 evaluating the Executive’s compliance.[7] Id. (concluding that habeas review did not extend to permit review of the Executive’s determination that it was in compliance ■with § 5270’s requirement that “the evidence [was] sufficient to sustain the charge under the provisions of the treaty”); see Benson v. McMahon, 127 U.S. 457, 460-63, 8 S.Ct. 1240, 32 L.Ed. 234 (1888) (noting the limits of § 5270 and the relevant treaty). Before we may address either of these questions, however, we must consider the threshold matter of our jurisdiction.
1
The government contends that two different statutory provisions negatively affect our jurisdiction over Trinidad’s claim: subsection (d) of the FARR Act and 8 U.S.C. § 1252(a)(4)(d). We must determine whether either overcomes the lofty standards for precluding habeas jurisdiction established by the Court in INS v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).
Courts are not to conclude lightly that a statute precludes habeas review. Rather, the Supreme Court has directed that two principles must be considered:
“First, as a general matter, when a particular interpretation of a statute invokes the outer limits of Congress’ power, we expect a clear indication that Congress intended that result.” St. Cyr, 533 U.S. at 299, 121 S.Ct. 2271. “[Wjhere a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress’ intent.” Demore v. Kim, 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 *969 (2003) (noting that the Court held in St. Cyr, 533 U.S. at 308-09, 121 S.Ct. 2271, that a provision titled “ ‘Elimination of Custody Review by Habeas Corpus,’ along with broad statement of intent to preclude review, was not sufficient to bar review of habeas corpus petitions”); St. Cyr, 533 U.S. at 298, 121 S.Ct. 2271 (citing cases refusing to bar habeas review where there was no specific mention of the Court’s authority to hear habeas petitions); id. at 327, 121 S.Ct. 2271 (Sealia, J., dissenting) (arguing that the majority “fabricates a superclear statement, ‘magic words’ requirement for the congressional expression of’ an intent to preclude habeas review).
Second, even if a sufficiently clear statement exists, courts must evaluate whether “an alternative interpretation of the statute is ‘fairly possible.’ ” St. Cyr, 533 U.S. at 299-300, 121 S.Ct. 2271 (“[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is ‘fairly possible,’ see Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), we are obligated to construe the statute to avoid such problems.”). If so, courts are instructed to effectuate that interpretation rather than the constitutionally suspect alternative. Id. at 299-300, 300 n. 12, 52 S.Ct. 285 (“ ‘As was stated in Hooper v. California, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895), “[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality....” The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.’ ” (first alteration in original) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988))).
As concluded by the First and Second Circuits, the FARR Act fails to overcome even the first of St. Cyfs concerns, sufficient clarity. Saint Fort v. Ashcroft, 329 F.3d 191, 200-02 (1st Cir.2003) (concluding that the FARR Act does not preclude habeas jurisdiction, at least in the immigration context); Wang v. Ashcroft, 320 F.3d 130, 140-42 (2d Cir.2003) (same). But see Mironescu v. Costner, 480 F.3d 664, 674 (4th Cir.2007).[8] Primarily, the pertinent provision, § 2242(d),[9] speaks only in terms of review, not habeas. This alone appears dispositive. Demore, 538 U.S. at 517, 123 S.Ct. 1708; St. Cyr, 533 U.S. at 298, 121 S.Ct. 2271. But see St. Cyr, 533 U.S. at 327, 121 S.Ct. 2271 (Sealia, J., dissenting) (arguing that specific mention of “habeas” is not required). Moreover, § 2242(d) can readily be interpreted as jurisdiction-neutral — neither providing nor precluding jurisdiction. It thus falls far short of the “particularly clear statement” necessary for us to conclude that Congress intended to bar habeas review. Demore, 538 U.S. at 517, 123 S.Ct. 1708; St. Cyr, 533 U.S. at 298, 121 S.Ct. 2271.
Section 1252(a)(4) does not suffer from the same infirmity. It clearly demonstrates congressional intent to preclude *970 habeas review of a broad category of claims when it declares:
Notwithstanding any other provision of law (statutory or nonstatutory) including section 22j.l of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e) of this section.
§ 1252(a)(4) (emphasis added). It easily hurdles the first of St. CyPs requirements, see Demore, 538 U.S. at 517, 123 S.Ct. 1708; St. Cyr, 533 U.S. at 298, 121 S.Ct. 2271, and gives us cause to consider St. CyP s second admonition — whether a “fairly possible” alternative interpretation exists that would allow us to avoid resolving the “difficult” constitutional question that might otherwise arise, i.e., whether relying on § 1252(a)(4) to preclude habeas review would be consistent with the Suspension Clause.[10] See 533 U.S. at 299-300, 301 n. 13, 121 S.Ct. 2271 (“The fact that this Court would be required to answer the difficult question of what the Suspension Clause protects is in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that review was barred entirely.”).
In resolving the threshold element of this second admonition, whether a difficult Suspension Clause question in fact exists, see id. at 300-01, 121 S.Ct. 2271, we must consider the historical scope of the writ. Fortunately, the Court has already done much of the heavy lifting. In St. Cyr, the Court considered whether § 1252(a)(2)(C) (2000)[11] precluded courts from considering even “a pure question of law” — whether an alien was entitled to relief under “[sjection 212 of the Immigration and Nationality Act of 1952.” Id. at 295, 298, 300, 121 S.Ct. 2271. After noting that the Suspension Clause, at a minimum, protects the writ as it existed in 1789, the Court wasted little time in concluding that the writ had historically reached such questions:
In England prior to 1789, in the Colonies, and in this Nation during the formative years of our Government, the writ of habeas corpus was available to non-enemy aliens as well as to citizens. It enabled them to challenge Executive and private detention in civil cases as well as criminal. Moreover, the issuance of the writ was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or inteiyretation *971 of statutes. It was used to command the discharge of seamen who had a statutory exemption from impressment into the British Navy, to emancipate slaves, and to obtain the freedom of apprentices and asylum inmates. Most important, for our purposes, those early cases contain no suggestion that habeas relief in cases involving Executive detention was only available for constitutional error.
Id. at 301-08, 121 S.Ct. 2271 (emphasis added) (footnotes omitted). Moreover, the Court rejected the INS’s argument that the character of the underlying relief— mandatory or discretionary — -was relevant as to whether courts could traditionally entertain challenges to the overarching legal question of statutory eligibility. Id. at 307, 121 S.Ct. 2271 (“Habeas courts also regularly answered questions of law that arose in the context of discretionary relief.”). “Eligibility that was ‘governed by specific statutory standards’ provided ‘a right to a ruling on an applicant’s eligibility,’ even though the actual granting of relief was ‘not a matter of right under any circumstances, but rather is in all cases a matter of grace.’”[12] Id. at 307-08, 121 S.Ct. 2271 (citation omitted).
Given St. Cyr, I think it plain that Trinidad would historically have been entitled to habeas review of his claim to the extent he argues that the Convention or the FARR Act bind the authority of the Executive to extradite him — “a pure question of law.” See Munaf, 553 U.S. at 691-93, 700, 128 S.Ct. 2207 (discussing Valentine, 299 U.S. at 8-9, 57 S.Ct. 100). Thus, a serious constitutional question would arise were Congress to preclude our habeas review as to whether those statutory provisions actually curtailed Executive authority, unless some other forum or opportunity for review existed. See St. Cyr, 533 U.S. at 314, 121 S.Ct. 2271 (“If it were clear that the question of law could be answered in another judicial forum, it might be permissible to accept the INS’ reading of § 1252. But the absence of such a forum, coupled with the lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas of such an important question of law, strongly counsels against adopting a construction that would raise serious constitutional questions.”).
In this case, there is no substitute. Absent habeas review, Trinidad would never receive any judicial review of his claim that his extradition would violate statutory limitations on the Executive’s extradition authority. See, e.g., Valentine, 299 U.S. at 18, 57 S.Ct. 100; cf. Omar v. McHugh, 646 F.3d 13, 19 (D.C.Cir.2011), as amended.[13] *972 The threshold element of St. CyPs second admonishment is thus met — a serious constitutional question would exist were we to determine that § 1252(a)(4) precludes review of Trinidad’s legal claim.
Accordingly, we must consider whether an alternative interpretation is “fairly possible.” St. Cyr, 583 U.S. at 299-300, 121 S.Ct. 2271. Trinidad and amici urge us to conclude that one is; that § 1252(a)(4) should be interpreted as limiting habeas review only in the immigration context — a context in which individuals would be entitled to file a petition for review on their Convention claims and therefore would receive the modicum of process likely required to avoid a Suspension Clause issue. See H.R.Rep. No. 109-72, at 121 (2005), reprinted in 2005 U.S.C.C.A.N. 240, 299. I agree.
There are a number of indicators that Congress intended § 1252(a)(4) to be applicable only in the immigration context. Among other things, Congress enacted § 1252(a)(4) as part of the REAL ID Act, the effect of which we have considered limited to the immigration context. See, e.g., Singh v. Gonzales, 499 F.3d 969, 978 (9th Cir.2007) (“[B]oth §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal.”); Puri v. Gonzales, 464 F.3d 1038, 1041 (9th Cir.2006) (“[T]he REAL ID Act’s jurisdiction-stripping provisions ... [do] not apply to [the] claim because [the] claim is not a direct challenge to an order of removal.”). And, as the House Committee Report explicitly states, Congress did not intend to “preclude habeas review over challenges to detention that are independent of challenges to removal orders.” H.R.Rep. No. 109-72, at 122, reprinted in 2005 U.S.C.C.A.N. 240, 300. The bill was intended to “eliminate habeas review only over challenges to removal orders.” Id.; accord Pub. L. No. 109-13, Div. B, Title I, § 106(b), 119 Stat. 231, 311 (2005) (codified as a note to § 1252) (noting that the “amendments made by subsection (a) ... shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division”). Finally, the section title itself, “Judicial review of orders of removal,” and the subchapter title, “Immigration,” only further reaffirm this cabining of the section’s effect. Cf. Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (“[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.” (citation and internal quotation marks omitted)).
In light of St. Cyr, and the factors discussed above, I would conclude that § 1252(a)(4) does not deprive us of habeas jurisdiction over Trinidad’s claim because there is a “fairly possible” alternative interpretation — that § 1252(a)(4) applies only to those claims seeking judicial review of orders of removal.
2
Having concluded that we have habeas jurisdiction, I move to the first merits question: whether, as Trinidad contends, Congress actually intended to restrict the Executive’s extradition authority via the Convention, the FARR Act, or the implementing regulations. To resolve that question, I consider each in turn.
i
I do not dwell long on the Convention or its terms. Treaties “are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be ‘self-executing’ and is ratified on these terms.” Medellin, *973 552 U.S. at 505, 128 S.Ct. 1346 (citation and internal quotation marks omitted). The Convention satisfies neither condition.
The Senate expressly conditioned its ratification of the Convention on the fact that it was “not self-executing.” 136 Cong. Rec. 36,198 (1990); see also 136 Cong. Rec. S17486-01 (daily ed. Oct. 27, 1990) (statement of Sen. Terry Sanford) (rendering the advice and consent of the Senate in ratifying the Convention subject to the declaration that “the provisions of Articles 1 through 16 of the Convention are not self-executing”); S. Treaty Doc. No. 100-20, at 2 (1988). And, as I will explain shortly, the FARR Act did not implement the Convention in a manner that curtails the Secretary’s authority to extradite. See Munaf, 553 U.S. at 703 n. 6, 128 S.Ct. 2207 (“[Cjlaims under the FARR Act may be limited to certain immigration proceedings.”); cf. Saint Fort, 329 F.3d at 202 (concluding that the Act and regulations effectuated the Convention in the immigration context); Wang, 320 F.3d at 140 (same). The Convention therefore cannot affect the Executive’s authority under § 3184 except to the extent directed by the relevant regulations.
ii
The FARR Act requires greater scrutiny. In relevant detail, it provides:
(a) Policy. — It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.
(b) Regulations. — Not later than 120 days after the date of enactment of this Act [Oct. 21, 1998], the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.
(d) Review and construction. — Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section [this note] shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section [this note], or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252).
§ 2242.
Trinidad argues that subsection (a) is dispositive. He echoes the erroneous conclusion in Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1012 (9th Cir.2000) — a decision we expressly overrule today — in asserting that the FARR Act’s articulation of “policy” confers a binding, non-discretionary obligation on the Secretary. That cannot be.[14]
*974 First and foremost, one cannot glean congressional intent from a single sentence of a statute. Rather, because “[t]he meaning — or ambiguity — of certain words or phrases may only become evident when placed in context,” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), it is a “fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme,” Davis v. Mich. Dep’t of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). “[0]ur task is to fit, if possible, all parts into an harmonious whole.” FTC v. Mandel Bros., Inc., 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); see Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 18, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).[15]
*975 The Court’s example in Pennhurst is instructive. There, the Court considered whether Congress intended the “bill of rights” provision of 42 U.S.C. § 6010[16] to confer “substantive rights” or to impose “an obligation on the States.” 451 U.S. at 13, 15, 101 S.Ct. 1531. Plaintiffs pointed out that the statute explicitly spoke in terms of “rights” and “obligations” and therefore could not be interpreted as conferring anything less. Id. at 18, 101 S.Ct. 1531. The Court disagreed. It emphasized that courts cannot interpret a statute by relying solely on “a single sentence or member of a sentence,” and that the seemingly clear provisions relied upon by the plaintiffs were rendered ambiguous by the context of the remainder of the Act. Id. at 18-19, 101 S.Ct. 1531. Considering those other provisions, the Court concluded that § 6010 “does no more than express a congressional preference for certain kinds of treatment” — that it provides “simply a general statement of ‘findings’ ” that “justifies and supports Congress’ appropriation of money under the Act and guides the Secretary in his review of state applications for federal funds.” Id. at 19, 101 S.Ct. 1531 (emphasis added).
Thus, as Pennhurst demonstrates, even assuming that sub-section (a) could be interpreted as Trinidad suggests, we must test that interpretation against the remainder of the Act. Brown, 529 U.S. at 132, 120 S.Ct. 1291; Mandel Bros., 359 U.S. at 389, 79 S.Ct. 818. Sub-section (b) is particularly illuminating. Its directive that “the heads of the appropriate agencies prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture,” (emphasis added), conflicts with Trinidad’s assertion that the FARR Act itself implements the Convention and binds Executive authority. Cf. Alexander v. Sandoval, 532 U.S. 275, 290, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (“The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.”).
Congress did not direct the agency heads to further implement our obligations. Nor did Congress direct the agencies to promulgate regulations that conformed to or even considered the FARR Act. Rather, subsection (b) suggests that Congress intended the FARR Act to serve not as the implementing tool, but only as the mandate directing the promulgation of regulations that would implement the Convention. Cf. id. Rather than attempting to implement the Convention with a single broad stroke, Congress *976 wisely delegated the task to those who could act with more surgical precision, crafting regulations that take into account the intricacies and specific history of their respective areas of expertise.[17]
Subsection (d) also supports this view of the Act. Here again, Congress focuses not on the Act’s effect, but on the effect of the regulations. § 2242(d) (noting that the regulations will implement the obligations of the United States). In addition, as discussed, the provision is at best jurisdiction-neutral — neither providing nor barring jurisdiction. Congress specifically declined to provide a mechanism for “claims raised under the Convention” or the Act, “except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. [§ ] 1252).” Id. (emphasis added). This absence is telling. Cf. Sandoval, 582 U.S. at 290, 121 S.Ct. 1511. As the Court noted in Munaf, it suggests that Congress did not intend to impose an obligation on the Executive outside the removal context. 553 U.S. at 703 n. 6, 128 S.Ct. 2207 (“[Cjlaims under the FARR Act may be limited to certain immigration proceedings.”);[18] see § 2242(c), (e) (relying on provisions of the Immigration and Nationality Act); cf. Sandoval, 532 U.S. at 289, 121 S.Ct. 1511 (“Nor do the methods that § 602 goes on to provide for enforcing its authorized regulations manifest an intent to create a private remedy; if anything, they suggest the opposite.”).
Subsection (a) does nothing to disturb this interpretation of the intended import of the Act. Similar to the statute at issue in Pennhurst, it “does no more than express a congressional preference for certain kinds of treatment” and provides “simply a general statement of ‘findings’ ” that “justifies and supports Congress’ ” decision to instruct the agency heads to promulgate regulations “to implement” the Convention. Compare § 2242(a), with § 6010, and Pennhurst, 451 U.S. at 19, 101 S.Ct. 1531. And, if any obligations were independently conferred, those obligations were confined to the immigration context. § 2242(b)-(e); Munaf, 553 U.S. at 703 n. 6, 128 S.Ct. 2207. Even analyzed in the abstract, Congress’ framing of its statement in terms of “policy” undercuts Trinidad’s assertion that it confers a binding obligation. Pennhurst, 451 U.S. at 19, 101 S.Ct. 1531; see Gonzaga Univ. v. Doe, 536 U.S. 273, 288, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Certainly, as used in general language, the term “policy” connotes a precatory rather than obligatory import. Black’s Law Dictionary 1276 (9th ed. *977 2009) (defining policy as “general principles by which a government is guided in its management of public affairs”); Merriam-Webster’s Collegiate Dictionary 960 (11th ed. 2008) (“a high-level overall plan embracing the general goals and acceptable procedures especially] of a governmental body”), available at http://www. merriam-webster.com/dictionary/policy.
Similarly, when used by Congress, it demonstrates concern for “aggregate” effect, not “whether the needs of any particular person have been satisfied.” Gonzaga, 536 U.S. at 288, 122 S.Ct. 2268 (quoting Blessing v. Freestone, 520 U.S. 329, 343-44, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (“Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State’s Title IV-D program.”)). Contra Berzon Concurrence at 6456 (providing no support for its contrary interpretation). As the Court stated in Pennhurst, “ ‘Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred directions.’ ” 451 U.S. at 19, 101 S.Ct. 1531 (emphasis added) (quoting Rosado v. Wyman, 397 U.S. 397, 413, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970)).
“This is such a case.” See id. Subsection (a) “is too thin a reed to support the rights and obligations read into it by” Trinidad. See id. It only “fits” as part of a “harmonious whole” with the entirety of the Act, cf. Mandel Bros., 359 U.S. at 389, 79 S.Ct. 818, if interpreted as a “nudge” by Congress indicating Congress’ “preference” that when implementing the mandated regulations, the agency heads bear in mind the general policy of the United States “not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture.” See Pennhurst, 451 U.S. at 19, 101 S.Ct. 1531. It does no more.
iii
Finally, we reach those regulations promulgated to implement the obligations of the United States under the Convention: 22 C.F.R. §§ 95.1-95.4. Notably, not one could be interpreted as limiting Executive authority. To the contrary, each maintains the historical practice of leaving the ultimate extradition decision to the Executive’s discretion:
Decisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review. Furthermore, pursuant to section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277, notwithstanding any other provision of law, no court shall have jurisdiction to review these regulations, and nothing in section 2242 shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or section 2242, or any other determination made with respect to the application of the policy set forth in section 2242(a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252), which is not applicable to extradition proceedings.
§ 95.4 (emphasis added); see also § 95.3(b) (“[T]he Secretary may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions.” (emphasis added)).
In sum, neither the Convention, the FARR Act, nor the implementing regulations alter the historically recognized dis *978 cretion accorded to the Secretary by Congress to determine whether “to surrender [a] fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions.” § 95.3(b); see Munaf 553 U.S. at 702, 128 S.Ct. 2207 (describing the Executive’s discretion); Lopez-Smith, 121 F.3d at 1326 (same). As such, Trinidad has failed to even allege a claim for which relief may be granted, and, as the Court directed in Munaf, all that is left for us to do is order Trinidad’s petition promptly dismissed. 553 U.S. at 692, 705, 128 S.Ct. 2207.
3
Even were we to assume for the sake of argument that the Convention or the FARR Act confers a binding obligation on the Executive, that would still not aid Trinidad’s cause. As the Court made clear in Munaf, that we have the power to grant habeas relief does not mean that we must or even should exercise that authority in every case. Id. at 691-93, 700, 128 S.Ct. 2207 (instructing that “even where a habeas court has the power to issue the writ” it must question “ ‘whether this be a case in which [that power] ought to be exercised’ ” (alteration in original) (quoting Ex parte Watkins, 3 Pet. 193, 201, 7 L.Ed. 650 (1830) (Marshall, C.J.))); id. at 693, 128 S.Ct. 2207 (“The principle that a habeas court is ‘not bound in every case’ to issue the writ follows from the precatory language of the habeas statute, and from its common-law origins.” (citation omitted)); accord Lopez-Smith, 121 F.3d at 1326. Rather, we must consider whether “ ‘prudential concerns,’ Withrow v. Williams, 507 U.S. 680, 686, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), such as comity and the orderly administration of criminal justice,” require us “ ‘to forgo the exercise of [our] habeas corpus power,’ Francis v. Henderson, 425 U.S. 536, 539, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).” Munaf, 553 U.S. at 693, 128 S.Ct. 2207. And, as the Court’s own precedent demonstrates, this Rule of Non-Inquiry acts with particular force in the extradition context. Neely, 180 U.S. at 123, 21 S.Ct. 302; Oteiza, 136 U.S. at 334, 10 S.Ct. 1031; see Lopez-Smith, 121 F.3d at 1327 (“[Generally, under what is called the ‘rule of non-inquiry[1] in extradition law, courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely.”); see also Munaf, 553 U.S. at 693, 704, 128 S.Ct. 2207.
Thus, in Oteiza, the Court declined to scrutinize the Executive’s conclusion that it could extradite Oteiza to Cuba in conformity with the pertinent statutory framework because, while Congress had placed conditions on the Executive’s authority to extradite, it had never directed the judiciary to review the Executive’s conclusion that it had satisfied those conditions. 136 U.S. at 334, 10 S.Ct. 1031 (“A writ of habeas corpus in a case of extradition cannot perform the office of a writ of error.... [T]he decision of the commissioner cannot be reviewed by a circuit court or by this court, on habeas corpus, either originally or by appeal.”). Likewise, in Neely, the Court declined to delve into the conditions Neely expected to face upon refouler to Cuba or the circumstances under which he might be tried there because, again, Congress had not invited the court’s participation. See 180 U.S. at 123, 21 S.Ct. 302.
Similarly, in Munaf, these same principles led the Court to flatly reject the petitioners’ request that the Court review the Secretary of State’s decision to transfer them to Iraqi custody. 553 U.S. at 702-03, 128 S.Ct. 2207 (noting the “policy of the United States not to transfer an individual in circumstances where torture is likely to result” (emphasis added)). Instead of re *979 quiring the Secretary to turn over her files or justify her decision, the Court accepted the Solicitor General’s explanation that “such determinations are based on ‘the Executive’s assessment of the foreign country’s legal system and ... the Executive's] ... ability to obtain foreign assurances it considers reliable,’ ” and readily concluded that the “Judiciary is not suited to second-guess such determinations — determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government’s ability to speak with one voice in this area.” Id. at 702, 128 S.Ct. 2207 (alterations in original) (citation omitted).
The Court noted that absent a specific congressional directive to the contrary, see Neely, 180 U.S. at 123, 21 S.Ct. 302; Oteiza, 136 U.S. at 334, 10 S.Ct. 1031, we are to leave such delicate questions of diplomacy and foreign policy to those best suited to the task: the political branches. Munaf, 553 U.S. at 701, 702-03, 128 S.Ct. 2207 (“[T]he political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is.... ‘[W]e need not assume the political branches are oblivious to these concerns. Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks.’ ” (citation omitted)). See generally Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 417-18, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (“To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.” (citation and internal quotation marks omitted)). Accordingly, the Court declined to review either the process or the substance of the Secretary’s decision and concluded that the petition for habeas corpus should have been promptly dismissed. Munaf, 553 U.S. at 705, 128 S.Ct. 2207 (“Habeas corpus does not require the United States to shelter such fugitives from the criminal justice system of the sovereign with authority to prosecute them.”).
Notably, this historical reluctance to inquire into the merits of the Executive’s decision in this extradition context countermands most of my colleagues’ otherwise apt analysis as to why we traditionally would exercise our habeas power in other analogous situations. Pregerson Concurrence at 1004-06, 1007-09; Berzon Concurrence at 1010, 995-97. It also explains why my colleagues’ heavy reliance on Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), and wholesale discard of Munaf is particularly unpersuasive. Cf, e.g., Berzon Concurrence at 991 (asserting that “not only is there no applicable holding in Munaf; there is no applicable reasoning or implicit ‘message’ either”); id. at 995-1000 (relying on Boumediene to formulate its novel rule of limited inquiry).
To understand where my colleagues go astray, it is important to recognize an unequivocal truth: The opinions of my concurring colleagues depend on the complete inapplicability of Munaf. If Munaf applies, their reasoning fails. And, contrary to their suggestion, Munaf cannot be so conveniently dismissed as “of little use here.” Berzon Concurrence at 992; accord id. at 991 (claiming that “not only is there no applicable holding in Munaf; there is no applicable reasoning or implicit ‘message’ either”). First, Munaf s general directive regarding the proper utilization of our habeas power was not restricted to any particular context. Munaf, 553 U.S. at 693-94, 128 S.Ct. 2207. Rather, the Court spoke generally and thereafter relied on Neely, an extradition ease, as illustrative of its point. E.g., id. at 695-97, 128 S.Ct. 2207. Also, nearly all of the Court’s *980 discussion of the Rule’s history and application was premised on its prior application in extradition cases. E.g., id. at 695-97, 128 S.Ct. 2207 (discussing Neely); id. at 704, 128 S.Ct. 2207 (discussing Valentine ). Finally, Munaf itself discussed what other concerns might be implicated were Munaf an extradition case. Id. at 704-05, 128 S.Ct. 2207. There is thus no credible reason for so entirely, and easily, disregarding Munaf s guidance.
Moreover, in their attempt to invoke Boumediene to support their reasoning, my colleagues overlook three critical distinctions. The first is that Boumediene concerned the scope of the judiciary’s habeas review in the executive detention context — a context in which the Rule of Non-Inquiry has never been applied. The Court therefore did not consider what effect the Rule might have on Boumediene’s rationale were it to be applied in the extradition context.
Second, my colleagues overlook the fact that the predominate concern underlying Boumediene’s conclusion, indefinite executive detention, is not implicated in the present context. See id. at 693, 128 S.Ct. 2207. Rather than facing a circumstance in which “the consequence of error may be detention of persons for the duration of hostilities that may last a generation or more,” Boumediene, 553 U.S. at 785, 128 S.Ct. 2229, and thus “the need for collateral review is most pressing,” id. at 783, 128 S.Ct. 2229, we face a circumstance in which the consequence of error is in fact release from executive detention. As discussed in Munaf, this reality caused the Court to question whether habeas relief was even appropriate:
Habeas is at its core a remedy for unlawful executive detention. Hamdi v. Rumsfeld, 542 U.S. 507, 536 [124 S.Ct. 2633, 159 L.Ed.2d 578] (2004) (plurality opinion). The typical remedy for such detention is, of course, release. But here the last thing petitioners want is simple release; that would expose them to apprehension by Iraqi authorities for criminal prosecution — precisely what petitioners went to federal court to avoid. At the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign’s borders.
Munaf, 553 U.S. at 693-94, 128 S.Ct. 2207 (emphasis added) (citation omitted). Citing Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957), a transfer case, and Neely, an extradition case, the Court thereafter concluded: “as the foregoing cases make clear, habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them.” Munaf, 553 U.S. at 695-97, 128 S.Ct. 2207.
Finally, and perhaps most critically, my colleagues fail to account for the fact that Boumediene itself never held that habeas petitioners were entitled to relief. See 553 U.S. at 795, 128 S.Ct. 2229. To the contrary, Boumediene held “only that [the] petitioners before us are entitled to seek the writ; that the DTA review procedures are an inadequate substitute for habeas corpus; and that petitioners in these cases need not exhaust the review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court.” Id. This conclusion is fundamentally no different from that in Munaf. There, in a decision delivered on the same day as Boumediene, the Court began its analysis by considering and rejecting the government’s contention that the petitioners were precluded from seeking habeas relief. Munaf, 553 U.S. at 688, 128 S.Ct. 2207 (“ ‘Under the foregoing circumstances,’ we decline to extend our holding *981 in Hirota [v. General of the Army MacArthur, 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948) ] to preclude American citizens held overseas by American soldiers subject to a United States chain of command from filing habeas petitions.” (emphasis added)). As discussed, the Court thereafter made clear, however, that the simple fact that the courts “have the power to grant habeas relief does not mean that we must or even should exercise that authority in every case.” Supra at 978. Instead, citing the prudential concerns underlying the Rule of Non-Inquiry, the Court concluded that, though entitled to seek relief, Munaf, 553 U.S. at 688, 128 S.Ct. 2207, the petitioners were not entitled to obtain relief, which negated any purpose for subjecting the Executive’s decision to judicial review, id. at 692-94, 128 S.Ct. 2123 (“We accordingly hold that the detainees’ claims do not state grounds upon which habeas relief may be granted ... ”).
In sum then, the present case is no different from the litany of extradition cases that preceded it. Unlike the amended form of § 5270 or the current form of § 3184, the FARR Act in no way suggests that Congress invited, or even desired, the courts to take any part in the Secretary’s ultimate decision. Rather, § 2242(d) specifically provides to the contrary — that “nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal.” And the regulations promulgated “to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture” only further reinforce that intent. §§ 95.3(b), 95.4. Each simply maintain the historical status quo — the well-accepted understanding that Congress intends the ultimate extradition decision to be left to the Secretary’s discretion. See generally Lopez-Smith, 121 F.3d at 1327 (“Once the certificate issues, the Secretary may exercise discretion whether to extradite an American national. The Secretary’s exercise of discretion need not be based upon considerations individual to the person facing extradition. It may be based on foreign policy considerations instead.”). Accordingly, the Rule continues to apply to preclude our review.
B
Despite concluding that “[t]he doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary’s declaration,” Per Curiam at 957, my colleagues decline to put this case to rest. They ignore the Court’s concern for promptness, Munaf 553 U.S. at 692, 128 S.Ct. 2207, and reason that remand is necessary because the “record before us provides no evidence that the Secretary has complied” with her asserted obligation to “consider an extraditee’s torture claim and find it not ‘more likely than not’ that the extraditee will face torture” if extradited, Per Curiam at 957. In effect, my colleagues transform the Rule of Non-Inquiry into a rule of some inquiry or, as Judge Berzon would prefer, a more searching rule of “limited ” inquiry, thereby laying the groundwork for a morass of procedural challenges and even more delay in the extradition. They selectively ignore the Rule’s effect, and, without adequate explanation or support, subvert the clear import of the controlling regulations by imposing procedural conditions and proofs on the Secretary when both the regulations and the Rule clearly preclude just that — any inquiry. I will not willingly take part in such an unprecedented departure from either the facts in the record before us or our governing case law.
*982 First, there is no dispute that former Secretary of State Rice made the determination to order Trinidad’s extradition; rather, Trinidad himself admits as much. Second Petition for Writ of Habeas Corpus at 2 ¶¶ 2-9, No. 2:08-cv-07719-MMM (S.D. Cal. Sept. 17, 2008), ECF No. 1 (“[T]he Honorable Condoleeza Rice, Secretary of State, issued a surrender warrant for Trinidad____ Date of surrender warrant: September 12, 2008[.]”); Application for Order Staying Extradition at 3 ¶ 3, No. 2:07-cv-06387-MMM (S.D. Cal. Sept. 16, 2008), ECF No. 45(declaration of Craig Harbaugh, Trinidad’s attorney, made under penalty of perjury, that the Secretary had made the decision to extradite Trinidad). These admissions are “conclusive in the case.” Christian Legal Soc’y Chapter of the Univ. of Cal. v. Martinez, — U.S. -, 130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010) (quoting 2 K. Broun, McCormick on Evidence § 254 at 181 (6th ed. 2006)); Oscanyan v. Arms Co., 103 U.S. 261, 263, 26 L.Ed. 539 (1880) (“Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court’s procedure equally as if established by the clearest proof.”). They “have the effect of withdrawing a fact from issue and dispensing wholly with the need for [further] proof....” Perez-Mejia v. Holder, 641 F.3d 1143, 1151 (9th Cir.2011) (quoting Hoodho v. Holder, 558 F.3d 184, 191 (2d Cir.2009)).
They are also binding. United States v. Crawford, 372 F.3d 1048, 1055 (9th Cir.2004) (en banc) (“A judicial admission is binding before both trial and appellate courts.”). “Litigants, we have long recognized, ‘[a]re entitled to have [their] case tried upon the assumption that ... facts, stipulated into the record, were established.’ ” Christian Legal, 130 S.Ct. at 2983 (alterations in original) (emphasis added) (quoting H. Hackfeld & Co. v. United States, 197 U.S. 442, 447, 25 S.Ct. 456, 49 L.Ed. 826 (1905)). We must treat them as the “clearest proof.” Oscanyan, 103 U.S. at 263 (“And if in the progress of a trial, either by such admission or proof, a fact is developed which must necessarily put an end to the action, the court may, upon its own motion, or that of counsel, act upon it and close the case.”). We must treat them with the same degree of respect that the Court accorded the representations of the Solicitor General in Munaf 553 U.S. at 702, 128 S.Ct. 2207 (relying on the Solicitor General’s representations concerning the non-refouler policy of the United States).
Accordingly, having established that the Secretary made the requisite determination, we must adhere to the Supreme Court’s admonishment that, “in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.” Brown v. Plata, — U.S. -, 131 S.Ct. 1910, 1965, 179 L.Ed.2d 969 (2011) (alteration in original) (internal quotation marks omitted) (quoting United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting United States v. Chemical Found., Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926))); accord Postal Serv. v. Gregory, 534 U.S. 1, 10, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001) (“[A] presumption of regularity attaches to the actions of Government agencies.”). To chastise the State Department and call into question the regularity of the Executive’s treatment of Trinidad’s plight is a serious matter. See, e.g., Chew Heong v. United States, 112 U.S. 536, 540, 5 S.Ct. 255, 28 L.Ed. 770 (1884) (“[T]he court cannot be unmindful of the fact that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected.”).
To do so without any contrary evidence, “let alone clear evidence,” Plata, 131 S.Ct. at 1965, of irregularity is untenable. To do so without even an accusation of irregu *983 larity is appalling.[19] It wholly “want[s] in proper respect for the intelligence and patriotism of a co-ordinate department of the government.” Chew Heong, 112 U.S. at 540, 5 S.Ct. 255. Thus, even were the majority correct that “[t]he process due here is that prescribed by the statute and implementing regulation,” specifically that “[t]he Secretary must consider an extraditee’s torture claim and find it not ‘more likely than not’ that the extraditee will face torture before extradition can occur,” Per Curiam at 957 (citing § 95.2), we must presume the Secretary complied with any pertinent obligations. Plata, 131 S.Ct. at 1965.
Of course, the magnitude of the majority’s misstep is all the more pronounced because, as discussed, neither the FARR Act nor the regulations limit the Executive’s authority in the extradition context. See Munaf, 553 U.S. at 703 n. 6, 128 S.Ct. 2207; cf. Pennhurst, 451 U.S. at 19, 101 S.Ct. 1531. Neither do any contain the necessary “ ‘explicitly mandatory language,’ ie., specific directives to the decisionmaker that if the regulations’ substantive predicates are present, a particular outcome must follow, in order to create a liberty interest.” Ky. Dep’t of Carr. v. Thompson, 490 U.S. 454, 463, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (emphasis added) (citation omitted).
Frankly, the FARR Act contains nothing in the way of even mandatory language — other than its directive to create regulations to implement the United States’ obligations under the Convention— let alone specific directives or substantive predicates. § 2242. And the regulations are no different. Rather than using “ ‘explicitly mandatory language,’ in connection with the establishment of ‘specified substantive predicates’ to limit discretion,” Ky. Dep’t of Corr., 490 U.S. at 463, 109 S.Ct. 1904 (emphasis added), the regulations do the opposite. They carefully provide only that “the Department considers the question of whether a person facing extradition from the U.S. ‘is more likely than not’ to be tortured in the State requesting extradition when appropriate in making this determination.” § 95.2(b) (emphasis added). Contrary to my colleagues’ suggestion that “[t]he Secretary must consider an extraditee’s torture claim and find it not ‘more likely than not’ that the ex-traditee will face torture before extradition can occur,” Per Curiam at 957, the words “must” and “shall” are entirely lacking. § 95.2(b). Accordingly, the regulations can only be interpreted as maintaining the traditional status quo — allowing the Secretary unbridled discretion “to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions.” § 95.3(b) (“may”); § 95.4 (“Decisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review.”); cf. Lopez-Smith, 121 F.3d at 1326.[20]
*984 In sum, I disagree with my colleagues’ stubborn refusal to accept that the Secretary has “properly discharged” her duty and can conceive of no basis for countenancing a procedural due process claim. Neither the FARR Act nor the regulations impose on the Secretary a mandatory duty that could provide Trinidad with a liberty interest in the Secretary’s compliance with any procedure. Thus, just as Trinidad cannot ask that we second-guess the Secretary’s ultimate discretionary decision, see Munaf, 553 U.S. at 702, 128 S.Ct. 2207, he cannot ask us to peek into those internal processes employed by the Secretary in making her determination.[21] Non-inquiry means just that, non-inquiry, and remanding serves no purpose other than to further delay the inevitable. Id. at 692, 128 S.Ct. 2207 (“We accordingly hold that the detainees’ claims do not state grounds upon which habeas relief may be granted, that the habeas petitions should have been promptly dismissed, and that no injunction should have been entered.” (emphasis added)).
II
This case presents a straightforward question with a straightforward answer. Though we have habeas jurisdiction to consider Trinidad’s claim, that claim is squarely and entirely foreclosed by the Rule of Non-Inquiry. Id. at 702-03, 128 S.Ct. 2207. By needlessly remanding, the majority ignores both the Supreme Court’s concern for promptness, id. at 692, 128 S.Ct. 2207, as well as a litany of controlling legal principles. It interjects yet another obstacle to impede the United States from fulfilling its treaty obligations, damaging our sovereign reputation and undoubtedly undermining our ability to obtain the cooperation of other countries when we need extradition assistance.
The only proper outcome of this case is to reverse the award of habeas relief, vacate the district court’s discovery order seeking the Secretary’s file, and order Trinidad’s petition promptly dismissed. See id. We err by doing anything else.

. Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-761, 2681-822-23 (codified as a note to 8 U.S.C. § 1231). To the extent it is relevant to the questions of our jurisdiction and the merits of Trinidad’s habeas claim, the Act is set forth in greater detail infra at pages 6430-31.

. Congress has authorized the Executive to extradite individuals who have committed crimes in foreign countries pursuant to specific treaties. See 18 U.S.C. §§ 3181(a), 3184, 3186. Here, Trinidad is being extradited pursuant to the United States’ Extradition Treaty with the Philippines, U.S.-Phil., art. VII, Nov. 13, 1994, S. Treaty Doc. No. 104-16, 1994 WL 855110.

. Chief Judge Kozinski argues that we lack jurisdiction over Trinidad’s claim based on his cabining of Trinidad’s claim as strictly statutory or regulatory. E.g., Kozinski Partial Dissent at 1009-10. He distinguishes my reliance on Valentine based on his contention that “the Valentine extraditees’ challenge fell squarely within the second traditional category of habeas review of extradition ...: wheth *965 er the executive branch was operating under a valid treaty authorizing the extradition in question.” Id. at 1013. In short, he contends that treaty-based claims are cognizable under habeas, but statutory claims are not. I must disagree.
First, as a general matter, my respected colleague fails to adequately account for a baseline principle: "In the extradition context, when a 'fugitive criminal’ is found within the United States, ' "there is no authority vested in any department of the government to seize [him] and surrender him to a foreign power,” ’ in the absence of a pertinent constitutional or legislative provision." Munaf, 553 U.S. at 704, 128 S.Ct. 2207 (alteration in original) (quoting Valentine, 299 U.S. at 8-9, 57 S.Ct. 100). Accordingly, when an individual claims, as Trinidad does, that his extradition is precluded by the terms of a statute or regulations, he necessarily claims that the Executive has acted in excess of its Article II authority — irrefutably a constitutional question. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (finding that a question as to whether the Executive acted in excess of its inherent or delegated power presented a question of "constitutional validity”).
Moreover, Valentine itself does not support the narrow line my colleague draws. There, “My the writs of habeas corpus,” extraditees challenged the Executive’s decision to extradite them to France. 299 U.S. at 6, 57 S.Ct. 100. Their argument was simple: "the President had no constitutional authority to surrender the[m] to the French Republic.” Id. (emphasis added). The Court agreed. It expressed no hesitation in reviewing, and ultimately granting, their claims under its habeas power. Id. at 18, 57 S.Ct. 100.
Admittedly, Valentine itself concerned treaty limitations. That was after all the claimed basis for the Executive’s extradition authority as to those extraditees. Id. at 6, 57 S.Ct. 100 ("Respondents sued out writs of habeas corpus to prevent their extradition to France under the Treaty of 1939 (37 Stat. 1526).”). However, the Court made clear that its rationale was no less applicable to statutory limitations:
There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given by act of Congress or by the terms of a treaty, it is not enough that statute or treaty does not deny the power to surrender. It must be found that statute or treaty confers the power.
Id. at 9, 57 S.Ct. 100 (emphasis added). As noted by the Court, "The question is not one of policy, but of legal authority.” Id. at 6, 57 S.Ct. 100 (emphasis added). And there is no tenable justification for arguing that congressional statutes are less effective curbs on Executive extradition authority than treaties. The Court has made clear that the opposite is in fact true. See Medellin v. Texas, 552 U.S. 491, 505, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).
Finally, I wholeheartedly agree with my colleague that courts have traditionally rejected claims like Trinidad's that are based on the treatment an extraditee expects to receive in the receiving country. Cf. Kozinski Partial Dissent at 1009 (citing Neely, Oteiza, and Fernandez ). As Munaf makes abundantly clear, however, we cannot confuse our opinion as to the merits of his claim with his initial entitlement to review. 553 U.S. at 691, 700, 128 S.Ct. 2207 (concluding that "[t]he lower courts in Munaf erred in dismissing for want of jurisdiction,” even though it ultimately concluded that the petitioners could not challenge their transfer based on their belief that their “transfer to Iraqi custody is likely to result in torture”). Even assuming that Trinidad is not ultimately entitled to relief based on the treatment he expects in the Philippines, we have jurisdiction to review his claim. Id.

. Section 3184 provides:
Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. Such complaint may be filed before and such warrant may be issued by a judge or magistrate judge of the United States District Court for the District of Columbia if the whereabouts within the United States of the person charged are not known or, if there is reason to believe the person will shortly enter the United States. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

. Specifically, Congress amended § 5270 to add the following: "That such proceedings shall be had before a judge of the courts of the United States only, who shall hold such person on evidence establishing probable cause that he is guilty of the offense charged.” Act of June 6, 1900, ch. 793, 31 Stat. 656, 657.

. It is worthwhile to note that it is because of this reality that my colleagues' reliance on our immigration case law is unavailing. E.g., Pregerson Concurrence at 1007; Berzon Concurrence at 989-90. Unlike in the extradition context, Congress has expressly provided for judicial review of final orders of removal. E.g., 8 U.S.C. § 1252.

. Notwithstanding my discussion of Oteiza, Fernandez, and Neely, Judge Berzon erroneously argues that I rely on only the Court’s earliest Rule of Non-Inquiry jurisprudence to conclude "that judicial review in all extradition cases is limited to ... a narrowly circumscribed examination of a magistrate’s finding of extraditability and of the magistrate’s jurisdiction to enter such a finding.” Berzon Concurrence at 993. That is not true. I reiterate: the entirety of the Court’s Rule jurisprudence demonstrate that the scope of our review is not frozen in its 1890’s form, but rather ebbs and flows at Congress' direction.
Frankly, it is Judge Berzon who attempts to avoid the clear import of all of the Court's direction by artificially splitting the Court’s Rule jurisprudence into two allegedly "competing” strands. Id. at 993-94. This strawman allows her to ignore the clear import of the Court's earlier case law — case law that firmly rebuts her position — and thus disregard historic Rule principles. As Neely demonstrates, however, no actual distinction exists. 180 U.S. at 109-10, 21 S.Ct. 302 (relying upon the statute at issue in both Oteiza and Fernandez to support its conclusion). Just like Oteiza and Fernandez, Neely refused to extend judicial review in extradition cases, regardless of the nature of the perceived violation, absent specific direction from Congress. See id. at 109-10, 123, 21 S.Ct. 302 (noting the progression of § 5270 and considering that progression’s effect on the scope of its habeas review).
Moreover, in critiquing my steadfast adherence to that reality, Berzon Concurrence at 996-97, Judge Berzon compares apples to oranges when she equates judicial review of a specific extradition order with the judiciary’s longstanding power to review acts of Congress. Compare Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), with Oteiza, 136 U.S. at 334, 10 S.Ct. 1031 (concluding in 1890 that the "decision of the commissioner cannot be reviewed by a circuit court or by this court, on habeas corpus, either originally or by appeal” if, among other things, "the offense charged is within the terms of a treaty of extradition”). She disregards the fact that the Supreme Court has itself distinguished the judiciary’s power to review the broad question of Executive authority to extradite from a more myopic inquiry into the merits of the decision itself. Compare Berzon Concurrence at 996-97, with Oteiza, 136 U.S. at 334-35, 10 S.Ct. 1031 ("A writ of habeas corpus in a case of extradition cannot perform the office of a writ of error. ... ‘We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him, or declare him innocent and acquit him.’ ” (citation omitted)).

. Because the Fourth Circuit explicitly disclaimed any consideration of the Suspension Clause's effect, Mironescu, 480 F.3d at 677 n. 15 (“We also note that Mironescu does not argue that denying him the opportunity to present his CAT and FARR Act claims on habeas review violates the Suspension Clause. We therefore do not address that issue.”), its rationale is of limited persuasive value to my resolution of Trinidad’s more thoroughly argued claim. To be clear, though, I agree with Chief Judge Kozinski’s summation that, for all intents and purposes, our ruling as to jurisdiction in this context creates a circuit split.

. For the full text of § 2242(d), see infra pages 971-72.

. As provided in Article I, Section 9, Clause 2, of the United States Constitution, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.”

. The form of the statute at issue in St. Cyr provided:
Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.
§ 1252(a)(2)(C) (2000). It has since been amended. Pub. L. No. 109-13, Div. B, § 106(a)(l)(A)(ii) (2005) (inserting "(statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D)” after "Notwithstanding any other provision of law”).

. Courts have traditionally "recognized a distinction between eligibility for discretionary relief, on the one hand, and the favorable exercise of discretion, on the other hand.” St. Cyr, 533 U.S. at 307, 121 S.Ct. 2271. Whereas litigants were entitled to review of their purely legal challenges, they were not entitled to review of the ultimate decision as to whether to grant relief. Id. at 307-08, 121 S.Ct. 2271 (noting the "strong tradition in habeas corpus law ... that subjects the legally erroneous failure to exercise discretion, unlike a substantively unwise exercise of discretion, to inquiry on the writ" (quoting Gerald L. Neuman, Jurisdiction and the Rule of Law after the 1996 Immigration Act, 113 Harv. L. Rev. 1963, 1991 (2000))); see id. at 298, 121 S.Ct. 2271 ("[St. Cyr] does not dispute any of the facts that establish his deportability or the conclusion that he is deportable. Nor does he contend that he would have any right to have an unfavorable exercise of the Attorney General's discretion reviewed in a judicial forum. Rather, he contests the Attorney General’s conclusion that, as a matter of statutory interpretation, he is not eligible for discretionary relief.”). Thus, Congress could likely preclude review of the Secretary’s ultimate merits decision. Id. at 307-08, 121 S.Ct. 2271; see Oteiza, 136 U.S. at 334, 10 S.Ct. 1031.

. Like Munaf, Omar concerned transfer and not extradition, and thus did not need to account for the historical practice of permitting extraditees to challenge the legal authority of the Executive to extradite, Munaf, 553 *972 U.S. at 704, 128 S.Ct. 2207 — the cause for our Suspension Clause concern.

. I think it important to dispel at the very outset of my FARR Act discussion the erroneous assertion made by some of my esteemed colleagues that my position is at odds with the government's. Two examples more than demonstrate my point. The first pertains to my colleague’s representation that the government has emphatically asserted, Berzon Concurrence at 986, that “the FARR Act thereby 'prohibits the extradition of a person who more likely than not will be tortured, and ... *974 creates a duty on the part of the Secretary of State to implement that prohibition,’ ” Berzon Concurrence at 986 (citing the government’s brief at pages 4 and 66). As the record makes clear, the government said no such thing. Rather, the government in fact stated:
Trinidad has contended that Article 3 of the Torture Act prohibits the extradition of a person who more likely than not will be tortured, and that the FARR Act creates a duty on the part of the Secretary of State to implement that prohibition. While these contentions are correct, neither of those instruments makes justiciable the Secretary's surrender determination which is exclusively within the province of the Secretary of State.
Gov't Brief at 66 (emphasis added).
I fully agree with the government's actual position. Article 3 of the Convention does indeed purport to prohibit the extradition of individuals likely to be tortured. However, as explained, the Convention lacks the force of domestic law. Accordingly, as the government contends, Congress enacted the FARR Act to cause the "Secretary of State to implement that prohibition." Id. Thus, as I explain in this section and the following, we must turn to these regulations, and not to the Act, to ascertain the scope of the obligations actually imposed.
The second example concerns a similar misrepresentation: that the State Department has interpreted its own regulations as precluding it from "surrendering] a fugitive who more likely than not will be tortured, even if foreign policy interests at the time would be served by an extradition.” Berzon Concurrence at 989; see also Pregerson Concurrence at 1007-08. The government never advanced such a position in its briefs. Again, one need only turn to the actual text of the government's "interpretation” to see that the government offered no interpretation at all. Gov’t Brief at 4. Instead, the government was simply explaining that its position fell within the bounds of those matters Munaf held to be free from judicial second-guessing, cf. Munaf, 553 U.S. at 702, 128 S.Ct. 2207 ("[T]his is not a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway.”) — as demonstrated by the fact that the government thereafter cited Munaf for that very proposition. Id. (quoting Munaf, 553 U.S. at 702, 128 S.Ct. 2207).
Perhaps more worrisome, though, is that the government's position regarding the import of the regulations is wholly irrelevant to the point for which Judge Berzon attempts to demand deference: her contention that the statute itself implements the Convention or binds Executive authority. Cf. Berzon Concurrence at 988-89 (citing Chase Bank USA, N.A. v. McCoy, - U.S. -, 131 S.Ct. 871, 880, 178 L.Ed.2d 716 (2011)). Quite simply, one has nothing to do with the other. Compare Schleining v. Thomas, 642 F.3d 1242, 1246 (9th Cir.2011) ("Chevron deference to an agency's interpretation of an ambiguous statute applies only if the agency involved has formally interpreted the statute or promulgated a rule based on an implicit interpretation of the statute.”), with § 95.4 ("Decisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review." (emphasis added)), and § 95.3(b) ("[T]he Secretary may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions.” (emphasis added)).

. Judge Berzon’s attempts to distinguish Pennhurst are unpersuasive. As my discussion makes clear, I do not rely on the Court's explanation to argue in favor of some “super- *975 clear” words test. But see Berzon Concurrence at 986-88. Rather, I cite Pennhurst as one example among many wherein the Court has cautioned us to interpret a statute as a whole rather than by focusing on a single piece or provision — a mundane and well-established principle of statutory interpretation that my concurring colleagues disregard. To be sure, neither explains the inherent conflict between § 2242(a) (stating “the policy of the United States” (emphasis added)) and § 2242(b) (directing the Secretary to prescribe regulations “to implement the obligations of the United States” (emphasis added)) under their interpretations of the Act.

. The language at issue in Pennhurst provided: Congress makes the following findings respecting the rights of persons with developmental disabilities:
(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.
(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutio[n] ... that — (A) does not provide treatment, services, and habilitation which is appropriate to the needs of such person; or (B) does not meet the following minimum standards....
451 U.S. at 13, 101 S.Ct. 1531 (some alterations in original) (emphasis added).

. Accordingly, the Act is far from impotent. Contra Berzon Concurrence at 987-88. It serves as an affirmative mandate to the “agency heads" imposing on them an obligation to enact appropriate regulations. § 2242(b).

. Given this clear statement by the Court, I am unable to understand how Judge Berzon can contend that “the Supreme Court ... ha[s] taken the view that the FARR ACT implements CAT" in the extradition context. Berzon Concurrence at 989. The Court said precisely the opposite in Munaf.
Moreover, my colleague’s reliance on Medellin is similarly misplaced. Even setting aside the fact that Munaf followed Medellin and thus controls, Medellin did not state that the FARR Act itself implemented the Convention as my colleague contends. 552 U.S. at 520, 128 S.Ct. 1346. But see Berzon Concurrence at 989-90 (citing Medellin, 552 U.S. at 520, 128 S.Ct. 1346, for the proposition that "the FARR Act ... exemplifies] a statute by which a treaty (CAT) had been given 'wholesale effect ... through implementing legislation.’ "). Rather, the Court actually stated only that the Act "direct[ed] the ‘appropriate agencies' to 'prescribe regulations to implement the obligations of the United States under Article 3.’ ” Medellin, 552 U.S. at 520, 128 S.Ct. 1346. Thus, just as I contend, it is only the regulations, and not the Act itself, that could have affected the authority and discretion otherwise delegated by Congress to the Executive.

. Trinidad — -the very individual with every incentive to contest the fact that the Secretary actually made the "torture determination”— never questioned the reality of the Secretary’s decision. To be clear, no one has — no one other than my colleagues, who cast aside so many settled principles of law to do nothing more than act on a hunch to satisfy their own unsubstantiated suspicion.

. As Lopez-Smith states: "We suppose there is nothing to stop Lopez-Smith’s lawyer from putting together a presentation showing why the Secretary ought to exercise discretion not to extradite Lopez-Smith, and mailing it to the Secretary of State. As for whether the Secretary of State considers the material, and how the Secretary balances the material against other considerations, that is a matter exclusively within the discretion of the executive branch and not subject to judicial review.” 121 F.3d at 1326.

. And there is thus no need to wade into the merits of Judge Berzon's unprecedented "limited” departure from the Rule of Non-Inquiry.

. Those detained pending extradition have long been understood to be "in custody” for the purposes of habeas relief. See Ornelas v. Ruiz, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896); Oteiza v. Jacobus, 136 U.S. 330, 10 S.Ct. 1031, 34 L.Ed. 464 (1890); Benson v. McMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234 (1888); see also Gerald L. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 985 (1998).